Marlyn Edward **MARRAS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 69141.

Court of Criminal Appeals of Texas, En Banc.

Oct. 28, 1987.

Janet Seymour Morrow, (Court-appointed on appeal only), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and J. Harvey Hudson, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code § 19.03(a)(2). The appellant was convicted of intentionally causing the death of David L. Reed in the course of committing and attempting to commit the offense of aggravated robbery. After finding the appellant guilty, the jury returned affirmative findings to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death. We will reform the punishment to life and affirm.

The appellant raises twelve points of error. He challenges: the sufficiency of the evidence to support the finding that the offense took place during the commission of an aggravated robbery; the trial court's denial of his motion to quash the indictment; the exclusion of one prospective juror; the trial court's refusal to exclude another potential juror; the admission into evidence of a videotaped re-enactment of the events testified to by a prosecution witness; the trial court's refusal to charge the jury on voluntary manslaughter; the trial court's refusal to permit the appellant to submit additional testimony from cross-examination in response to a jury note; the trial court's failure to answer a jury note; the sufficiency of the evidence to support the jury's affirmative finding to special issue number two; and, finally, the effectiveness of the appellant's counsel at the punishment phase of the trial. Since the appellant argues that the evidence is insufficient to support both findings of guilt and future dangerousness, a detailed review of the facts is necessary.

During the guilt/innocence phase of the trial, Larry Flading testified that at about 10:00 p.m. on September 4, 1982, he and his brother met the appellant and another man in the parking lot outside the Blueberry Hill nightclub, located at the corner of Westpark and Gessner. The four men left the parking lot in a car, with the Flading brothers riding in the back seat, the appellant in the passenger seat, and the other man driving. Soon after they left the parking lot, the appellant told his companion that he wanted to return later to rob someone. The brothers parted company with the appellant and his companion at 10:30 p.m., about five miles from the parking lot.

About 11:30 p.m., the victim, Reed, and his companion, Joseph Weaster, left the Blueberry Hill nightclub. Both men were extremely intoxicated. The doorman at the club observed a fight between Weaster and the appellant on the sidewalk outside the club. The appellant yelled at Weaster that he did not like to be called names, hit Weaster twice in the face, and knocked him to the ground. As Weaster lay on the ground, the appellant kicked him in the head with his western boots. At that point, Reed, apparently coming to the aid of his friend, "jumped in the air and kicked and made an adrenaline-type yell." Reed then helped Weaster stand up and appeared to be trying to break up the fight.

Shortly thereafter, Barbara Baum, who was walking along a sidewalk nearby, saw Reed and Weaster approach their car in the

parking lot. The appellant stepped off the sidewalk and hurried toward Reed, who was standing on the driver's side of the car. The two exchanged words; Reed raised his hands; then the appellant pointed a gun at Reed's chest and fired one shot.

Reed jumped back, ran around the front of the car to the passenger side, and yelled, "I have had enough." Baum also heard someone say, "That is all I have got." After a few moments, Reed fell to the pavement. Weaster, who was then on the passenger side of the car, turned his pockets inside out. A passing cab driver, John Bernardoni, whose attention was drawn to the scene when he saw a flash and heard the gunfire, saw Weaster fall to his knees. Weaster appeared to give items from his pockets to the appellant and begged the appellant not to hurt him.

The appellant turned and walked toward the corner of a nearby apartment building. There he met briefly with another man before they turned together and walked into the apartment complex. Baum began following the two men through the corridors of the apartment building. She was joined by a Harris County Sheriff's Deputy who had been working at another nightclub nearby when the shooting occurred. Baum informed the deputy that a man had been shot, and she pointed out the appellant as the perpetrator. At the same time, the appellant saw Baum and the deputy, and he and his companion began to run. Baum and the deputy chased the two men, but during the pursuit the appellant and his companion split up. Baum and the deputy then split up, and Baum continued to chase the appellant. When the appellant ran inside a darkened building enclosure, Baum chose not to enter, and she returned to the scene of the shooting.

When Houston police officers arrived at the scene, Baum informed them that she had chased the appellant into the nearby apartment complex. Two officers, accompanied by Baum, retraced the appellant's path, searching the pavement and walkways. Baum saw the appellant lying behind some shrubs in a flower bed and identified him to the officers. The appellant was arrested there with the gun still in his hand.

At the punishment phase of the trial, Larry Flading testified that his "meeting" with the appellant, which he had described in veiled terms at the guilt/innocence phase of the trial, had in fact occurred in the course of the aggravated robbery of Flading and his brother, John, by the appellant and another man, Clifford Zataraus.

At approximately 10:00 p.m. on September 4, 1982, the Flading brothers drove to the parking lot at Westpark and Gessner, intending to go to Rockers, another nightclub in the same area as the Blueberry Hill club. As Larry parked his car, Clifford Zataraus and the appellant began walking across the parking lot toward them. The appellant headed toward the driver's side of the car while Zataraus went toward the passenger side. As John Flading got out of the car, Zataraus said, "This is a robbery. Get in the back seat of the car." At the same time, the appellant put a small pistol to Larry's head and warned, "You heard him." He instructed Larry to get in the back seat and to give him the car keys. The brothers moved into the back seat and handed the appellant the keys to the automobile.

The appellant then walked around to the passenger side of the car while Zataraus moved into the driver's seat. After entering the car on the passenger's side, the appellant pointed the gun at the Flading brothers and said, "This is going to be a robbery. We don't want to make it a murder." Once they were safely out of the parking lot, the appellant turned to Zataraus and said, "That worked out pretty good. We'll have to go back and do it again." As they drove down Gessner, the appellant ordered John and Larry Flading to take out all of their money. As the two men began emptying their pockets, John slipped several credit cards out of his wallet. As he attempted to conceal them in his boot, John watched the two men in front of him, hoping that they would not notice that he was keeping the credit cards from them. Zataraus looked into the rear view mirror

and shouted to the appellant, "He's looking at me. Man, he's looking at me. He's trying to identify me." The appellant immediately turned and hit both of the Flading brothers in the face. While Larry sat bleeding from the mouth, Zataraus urged the appellant to go ahead and kill both of the men.

As the two brothers handed over their money, the appellant became angry that they did not have more than about twenty dollars each. Larry told them, "That's all we've got. That's all we've got." Zataraus then said to the appellant, "I bet you he will come up with more money if you blow his friend's head off." The appellant then turned to Zataraus and shouted, "Don't tell me what to do. I'll do what I want." The appellant became so angry that it appeared for a moment that he might shoot Zataraus.

Apparently satisfied that they had taken all the money they could from the brothers, the appellant and Zataraus stopped the car in a dark corner of an apartment complex. The appellant jumped out of the car, and, motioning with the gun, ordered the Flading brothers to get out. John and Larry got out of the car with their hands raised and began to slowly back away. When they drew close to a parked van, John grabbed Larry and pulled him behind the van. They ran into the apartment complex, and eventually found a resident who summoned the police.

In addition to the unadjudicated robbery and aggravated kidnapping of the Flading brothers, the State established that the appellant had been previously convicted of nine felony offenses, including three cases of forgery, two cases of possession of marijuana, two cases of robbery by assault, escape, and burglary of a building with intent to commit aggravated robbery and kidnapping. For these offenses, the appellant was sent to the Texas Department of Corrections four times.

Apart from the evidence of extraneous offenses and prior convictions, the following evidence was adduced at the punishment phase. Two Houston police officers testified that the appellant had a bad reputation for being a peaceable, law-abiding citizen. A third Houston police officer, Sergeant Runnels, testified that he had known the appellant for nine years, off and on, when the appellant was in jail custody. He said the appellant was given a pass to work in the jail during the time he was awaiting trial in this case. Although the jail's policy generally excluded that status for inmates charged with capital murder, an exception had been made for the appellant. Runnels said the appellant had had a job as an inmate barber, using a straight razor to give shaves, and had in fact given him a shave. He stated he had never seen the appellant fight in jail.

In point of error three, the appellant asserts that the evidence is insufficient to prove that the killing occurred in the course of committing the aggravated robbery of Reed. The appellant argues that the State relied on circumstantial evidence to establish the robbery, and that the evidence supports a reasonable inference other than the appellant's guilt. Specifically, the appellant argues that it is reasonable to infer from the evidence that his motive for shooting Reed arose from anger, rage or resentment in the course of a fight, rather than a desire to commit aggravated robbery.

■ When reviewing the sufficiency of the evidence to support a conviction in either a direct or circumstantial evidence case, this Court must review the evidence in the light most favorable to the jury's verdict and consider whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Duhamel v. State*, 717 S.W.2d 80 (Tex.Cr.App.1986). Given the appellant's statement approximately an hour before the shooting that he was going to return to the parking lot where the killing occurred in order to commit an aggravated robbery, and the phrase uttered by one of the robbery victims, "That is all I have got," heard contemporaneously with the shooting, we find that the evidence overwhelmingly supports the State's theory that the killing

took place in the course of the commission of an aggravated robbery. Point of error three is overruled.

In his tenth point of error, the appellant contends that the trial court erred in denying his supplemental motion to quash the indictment, which asserted that the indictment denied him proper notice by alleging a lesser (and non-existent) offense, to wit, murder in the course of an attempt to commit attempted theft.

The appellant reasons that because the offense of aggravated robbery allows a conviction for conduct that occurs in the attempt to commit theft, and a conviction for an attempted offense is one category lower than the offense attempted, and the indictment reads "while in the course of committing and *attempting* to commit the aggravated robbery" (emphasis added), then a conviction for capital murder could be obtained under this indictment upon proof of a non-existent lesser included offense, to wit, attempt to commit attempted theft.

A person commits the offense of capital murder if he "intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, or arson." V.T.C.A., Penal Code § 19.03(a)(2).

The indictment alleged that the appellant did "then and there unlawfully while in the course of committing and attempting to commit the aggravated robbery of David L. Reed, hereafter styled the Complainant, intentionally cause the death of the Complainant by shooting the Complainant with a gun...."

■ This Court has upheld capital murder indictments which were identical to the instant indictment in the face of a motion to quash. See *Landry v. State*, 706 S.W.2d 105, 107–08 (Tex.Cr.App.1985), and cases cited therein. Generally, an indictment tracking the language of the penal statute in question is legally sufficient to provide the defendant with notice of the charged offense. *Beck v. State*, 682 S.W. 2d 550, 554 (Tex.Cr.App.1985). Appellant's tenth point of error is overruled.

■ In point of error eleven, the appellant contends that the trial court erred in sustaining the State's challenge for cause to venireperson Lowell Eugene Williams because such was a violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed. 2d 581 (1980); and Article 35.16(b)(3), V.A. C.C.P. We disagree with this contention.

In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper test for excusal of a potential juror is whether the juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851–52.

Article 35.16(b)(3), supra, provides that the State may challenge for cause any potential juror who "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment."

We must carefully examine the entire voir dire examination of venireperson Williams in order to determine whether he was improperly excluded, giving deference to the trial judge who was in a position to see and hear the juror. *McCoy v. State*, 713 S.W.2d 940 (Tex.Cr.App.1986).

Following are excerpts of testimony from the voir dire examination of Williams:

Q: [BY PROSECUTOR] Assume with me in a hypothetical situation that the only evidence you would have at that phase of trial [punishment] would be evidence of a capital murder. And you can make those facts in your mind as gruesome and horrible a capital murder as you can conceive of.

Do you feel like there could be a situation like that that would be the most horrible facts you could consider and that this was the only evidence you had to consider in this question, would you be able to answer this question [special issue two as to future dangerousness] either yes or no based on the evidence that you heard?

A: I do not feel that one act alone would give me enough evidence to indicate probability of a person's future conduct.

\* \* \* \* \* \*

Q: So, my question to you would be this: In every case that you heard, capital murder case, where there was nothing available for you to consider except the facts of the offense itself; that is, you have heard the guilt phase of the trial and found the person guilty. And that's all the evidence you are going to have to answer these questions, that in each and every case you would have to vote no as to Question No. 2?

A: I would have to vote no.

\* \* \* \* \* \*

Q: What I am trying to find out from you is if there is just evidence of one transaction, that is the one you found him guilty of capital murder, could you answer this question yes if you believe that evidence on a reasonable doubt that it should be answered yes? Or is there just no way I could ever prove it to you if the only thing was one transaction of capital murder regardless of how horrible it is?

A: Mr. Hansen, I would say you would be in a very, very hard uphill battle to convince me if all you have is the one offense to answer that question yes.

\* \* \* \* \* \*

A: Let me rephrase your question in my own words and see if you feel like I am getting the proper understanding of your question.

You want to know if you provide me with a snapshot picture of a single event in an individual's life whether or not I can then make a judgment as to the probability of either similar or dissimilar snapshots but, at least, of a criminal nature occurring in the future. And I cannot do that. I cannot predict based upon a single snapshot of an individual no matter what the picture is of.

Q: [BY DEFENSE COUNSEL] And the question in a nutshell is whether or not

you can follow the law and if the State convinces you beyond a reasonable doubt that those answers should be yes, could you then in fact answer them yes? Could you do that?

A: Yes.

\* \* \* \* \* \*

Q: Let's take the situation that Mr. Hansen gave you. A man kidnaps 40 school kids and takes them out and puts them in a bus and goes away and calls the Mayor; send me $5,000,000; Mayor sends $5,000,000. He brutally dissects them and kills them anyway. That's capital murder. Those are extreme examples.

My question to you is: could you consider answering Question No. 2 yes or no in the most extreme facts you could think of?

A: Well, certainly I can answer the question based on just this one snapshot. And what I have told Mr. Hansen is that I would probably answer the question no.

Q: Could you consider answering it yes if the facts were strong enough?

A: No.

Q: Ever?

A: No, I do not believe that one picture of a person's life gives an adequate basis for a person to make a judgment call on that. . . .

When asked again by the court, Williams again responded that "in my heart, [I] would have to answer no to that question." One final attempt by defense counsel produced the response, "just solely making a decision based on the criminal conduct that is involved before the jury at that time, no, most definitely, no."

Williams repeatedly said that he could not answer yes to the second special issue based solely upon the evidence of the capital offense. Clearly, then, Williams was biased against the law upon which the State was entitled to rely. See Article 35.-16(b)(3), supra; see also *Hawkins v. State*, 660 S.W.2d 65, 82 (Tex.Cr.App.1983; *Muniz v. State*, 573 S.W.2d 792, 795 (Tex.Cr.App.1978). Furthermore, his beliefs would

have substantially impaired the performance of his duties as a juror in accordance with his instructions and his oath. See *Witt,* supra; *Adams,* supra. The trial court did not err in sustaining the State's challenge for cause to venireperson Williams. Appellant's eleventh point of error is overruled.

In point of error twelve, the appellant alleges that the trial court abused its discretion in refusing his challenge for cause to venireperson Lee V. Dean for physical incapacity under Article 35.16(a)(4), V.A.C. C.P.[1] This provision allows a challenge for cause by either the state or the defense if the juror "has such defect in the organs of feeling or hearing, or such bodily or mental defect or disease as to render him unfit for jury service...." *Id.*

During voir dire examination, Dean was asked if there was any reason that would prevent him from sitting as a juror in the case. He answered, "Nothing other than unless I got sick." Dean informed the trial court that he was a disabled veteran, that he had one lung partially stopped up, that he had had one lung collapse in 1959, that he was prone to colds because he had had tuberculosis, that when he caught a cold it could be very serious and require hospitalization, and that some years he got sick and some years he did not get sick. Dean also informed the trial court that he had some difficulty hearing if someone did not speak up or if they spoke in low tones. He stated that he had had his hearing tested within the past year and was told by his doctor that his problem was not serious. The trial court asked him, "Are you satisfied you could sit on this jury and not be troubled subject to the same illness as everybody else is subject to?" Dean answered, "Yes." The trial court overruled the appellant's challenge for cause based on health problems.

The appellant relies on *Woolls v. State,* 665 S.W.2d 455 (Tex.Cr.App.1983), which we find distinguishable. In *Woolls,* the prospective juror admitted during voir dire that due to his hearing defect he had not heard the name of one of the attorneys,

had difficulty hearing that attorney when he spoke, and could not hear him at all if the attorney spoke while looking down and while reading. The juror stated that on the first day when he had been sitting at the back of the courtroom he had missed some of what was said to the panel. However, in the instant case, Dean evinced no difficulty in hearing the questions put to him during voir dire. He simply informed the court that if someone spoke too quietly he would have difficulty hearing him.

The trial court has the responsibility for determining the qualifications of a prospective juror when a challenge is made. *Villarreal v. State,* 576 S.W.2d 51, 63 (Tex.Cr.App.1978); Article 35.21, V.A.C. C.P. It was certainly within the court's discretion to overrule the challenge for cause based on a hearing problem in this instance. See *Chappell v. State,* 519 S.W. 2d 453 (Tex.Cr.App.1975).

As for the possibility that Dean could become ill during the proceedings, based on all the testimony, the likelihood appeared to be about the same as for any other juror becoming ill. Certainly Dean was not greatly concerned; he simply stated that he wanted to let the court know in advance that it might happen. When questioned by the trial court, Dean said that he was satisfied that he could sit on the jury. This is quite the reverse of the situations in *Hernandez v. State,* 643 S.W.2d 397 (Tex. Cr.App.1982) and *Villarreal v. State,* 576 S.W.2d 51 (Tex.Cr.App.1978), where the jurors expressed doubt about their ability to serve on the jury. Under the facts of the instant case, the trial court did not abuse its discretion in overruling the appellant's challenge for cause to venireperson Dean. Appellant's twelfth point of error is overruled.

In his fourth, fifth, and sixth points of error, the appellant complains that the admission of a videotape was an abuse of the trial court's discretion because (1) it was not an accurate duplication; (2) its prejudicial effect outweighed its probative value;

1. Now codified in Article 35.16(a)(5), V.A.C.C.P.

and (3) it bolstered the testimony of the State's witness, Barbara Baum.

The videotape complained of herein has been reviewed by this Court and contains no audio portion, only video, i.e., motion pictures. Motion pictures are just a collection of photographs and the rules surrounding admission are the same as those for still photographs. *Housewright v. State*, 154 Tex.Cr.R. 101, 225 S.W.2d 417 (1949). Motion pictures are admissible when they are properly authenticated, relevant to an issue, and not violative of the rules of evidence for the admissibility of photographs. *Lopez v. State*, 630 S.W.2d 936 (Tex.Cr.App.1982). When a verbal description of a scene is admissible, a photograph or video recording of the scene would also be admissible. *Wilkerson v. State*, 726 S.W.2d 542, 547 (Tex.Cr.App. 1986); see *Burdine v. State*, 719 S.W.2d 309, 316 (Tex.Cr.App.1986). The trial judge has broad discretion in admitting video recordings and his action will not be disturbed absent an abuse of that discretion. See *Burdine*, 719 S.W.2d at 316.

The videotape, which the appellant describes as a "re-enactment of the events testified to by Baum," shows a partial re-enactment of the route taken by Baum when she overheard the loud conversation between the appellant and Reed, observed the shooting and followed appellant from the scene. A man portrayed the part of the appellant to the extent that he retraced the path taken by the appellant after the shooting, with Baum following him to illustrate the distance between them at the time. The tape also shows Baum pointing to the flower bed where appellant was found hiding.

The tape was played for the jury while Baum answered questions and used a pointer to show the path she followed on the night in question. She explained discrepancies between the area as shown on the tape and as it appeared that night, such as the lighting, and the different bushes in the flower bed.

The appellant first argues that the videotape is not an accurate "duplication." The appellant asks this Court to follow the reasoning in *Lopez v. State*, 651 S.W.2d 413 (Tex.App.—Fort Worth 1983), a published opinion which was later withdrawn. In *Lopez*, the court of appeals held that "any staged, re-enacted criminal acts or defensive issues involving human beings are impossible to duplicate in every minute detail and are therefore inherently dangerous, offer little in substance and the impact of re-enactments is too highly prejudicial to insure the State or the defendant a fair trial." We find this reasoning sound, but inapplicable to the instant case. The videotape in this instance was merely a series of pictures of the route taken by appellant and Barbara Baum after the shooting of Reed. The videotape does not depict any staged, re-enacted criminal acts.

The appellant next argues that the prejudicial effect of the videotape outweighed its probative value. We disagree. The tape and the accompanying testimony attempted to clarify for the jury the location of Baum in relation to the events she witnessed and testified about. "If a verbal description of the material portrayed is admissible, then a photograph reflecting the verbal testimony is also admissible." *Wilkerson v. State*, 726 S.W.2d 542, 547 (Tex.Cr.App.1986). This reasoning is equally applicable to a videotape. See *Housewright*, supra. We find that the probative value of this videotape was not outweighed by its prejudicial effect.

Finally, the appellant complains that the videotape should not have been admitted because it bolstered the unimpeached testimony of Barbara Baum. This contention was addressed by this Court in *Roy v. State*, 608 S.W.2d 645 (Tex.Cr.App. 1980), and was found to be without merit. In *Roy*, we explained that the "[a]ppellant's position, that anytime there is a witness who testifies to a transaction, thereafter all additional evidence constitutes bolstering, would act to exclude the introduction of all tangible and scientific evidence, even when a proper predicate has been laid. This contention finds no support in the case law." *Roy*, 608 S.W.2d at 649. This videotape was merely a visual aid, like a photograph

or a diagram on a blackboard. It did not constitute bolstering of Baum's testimony.

 For these reasons, we find that the trial court did not abuse its discretion in admitting the videotape. Points of error four, five, and six are overruled.

In point of error number two the appellant asserts as reversible error the trial court's failure to submit a charge on voluntary manslaughter. The appellant contends that the issue of sudden passion was raised by the evidence and, therefore, the voluntary manslaughter charge should have been submitted.

 If evidence from any source raises the issue of a lesser included offense or a defensive theory, it must be included in the court's charge. *Marquez v. State*, 725 S.W.2d 217, 223 (Tex.Cr.App.1987). As this court said in *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Cr.App.1978):

> The credibility of evidence and whether it is controverted or conflicts with other evidence in the case may not be considered in determining whether a defensive charge or an instruction on a lesser included offense should be given. When evidence from any source raises a defensive issue or raises an issue that a lesser included offense may have been committed ... the issue must be submitted to the jury. It is then the jury's duty, under the proper instructions, to determine whether the evidence is credible and supports the defense or the lesser included offense.

 A charge on voluntary manslaughter should only be given when there is evidence that the defendant acted under the "immediate influence of sudden passion arising from adequate cause." *Marquez v. State*, 725 S.W.2d at 223–24. The sudden passion must be directly caused by and arising out of provocation by the deceased at the time of the offense. Passion solely the result of former provocation is insufficient. *Hobson v. State*, 644 S.W.2d 473, 478 (Tex.Cr.App.1983); V.T.C.A., Penal Code § 19.04(b). Adequate cause is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a per-

son of ordinary temper, sufficient to render the mind incapable of cool reflection." V.T.C.A., Penal Code § 19.04(c).

The appellant contends the evidence raises the issue of sudden passion because he and Reed had been in a fight prior to the shooting. The evidence, as recited earlier in this opinion, revealed that the appellant was overheard yelling at Weaster. He punched Weaster in the face twice, knocking him down, then began kicking him in the head. Reed intervened by jumping in the air and kicking the appellant while letting out an "adrenaline-type yell." Reed then asked Weaster why he had called the appellant names. The three began talking. A short time later, the appellant and Reed were observed talking loudly. Reed then raised his hands and the appellant shot him in the chest. The appellant robbed Weaster, who was on his knees begging not to be hurt. Then the appellant turned and walked casually away, appearing "totally unconcerned."

The only evidence of actions by Reed prior to the shooting were kicking the appellant and breaking up the fight between Weaster and the appellant. The conversation between Reed and the appellant just prior to the shooting is not revealed in the record.

In *Ojeda v. State*, 712 S.W.2d 742 (Tex. Cr.App.1986), the evidence revealed that the defendant and his girlfriend had been struck by the deceased, after which the defendant became involved in the fight. There was no direct evidence showing that the defendant was acting under sudden passion, nor as to his frame of mind at the time of the incident. Whether the defendant was cool and collected in defending himself or enraged at being hit and seeing his girlfriend hit was not shown by the evidence. This court held that in the absence of evidence that the defendant had acted in sudden passion, the issue of voluntary manslaughter had not been raised. *Ojeda*, 712 S.W.2d at 744.

 An instruction on voluntary manslaughter is properly refused where there is no evidence of adequate cause. *McCartney v. State*, 542 S.W.2d 156, 160

(Tex.Cr.App.1976). After viewing the evidence of the alleged provocation in the instant case objectively, we conclude that there is no evidence of adequate cause to warrant a charge on voluntary manslaughter. *Hobson*, 644 S.W.2d at 478; Section 19.04(c), supra. The trial court did not err in refusing the instruction. Point of error number two is overruled.

■ In his first point of error the appellant alleges that the trial court erred in refusing his request to read back additional testimony, elicited at cross-examination, in response to a jury note. The appellant contends that such refusal was an abuse of discretion under Article 36.28, V.A.C.C.P. and "a violation of appellant's due process rights."

During deliberations the jury sent out a number of notes, one of which read as follows:

1. The jury is in disagreement over the exact phrasing of Barbara Baum's testimony with regard to two points:

a. the wording of the three phrases which she did hear clearly.

b. whether she heard the phrase "That's all I've got"

i. *coming* from the driver's side of the car;

ii. or just *while* the two individuals were standing on the driver's side of the car.

The appellant complains that the testimony that was read back to the jury was not sufficient to answer the jury's question, and that further testimony from the cross-examination of Baum should also have been read to the jury. Unfortunately, the record does not reflect what testimony was read to the jury in response to this query. The statement of facts merely says, "(Reporter reads back)".

The appellant neither objected to this omission in the record, nor requested permission to supplement the record. See Article 40.09(7), V.A.C.C.P.[2] Instead, the appellant has included an appendix in his brief which purports to reveal the two sections of testimony that were read back to the jury in response to this note. The appendix is followed by a sworn statement from the court reporter attesting that this was indeed what she read to the jury.

In response, the State attached to its brief a controverting affidavit in which the same court reporter stated that the trial had occurred more than two years ago, and she had no independent recollection of what testimony was read back. She merely looked at her stenographic tape for paper clip markers to determine what testimony she had read to the jury. She found at least three sections which were so marked. She then stated that it was never her intention to represent that the transcribed testimony, attached to the affidavit she made for appellant, was the *only* testimony read back to the jury.

"An appellate court may not rely upon an invalid supplement to a record in deciding a defendant's appeal; an appellate court is limited to those portions of the record which have been properly approved." *Farris v. State*, 712 S.W.2d 512, 514 (Tex.Cr.App.1986). However, reliance on an invalid record may be harmless if the appellate court could have correctly supplemented the record on its own motion. *Id.* at 515; *Armstead v. State*, 692 S.W.2d 99 (Tex.Cr.App.1985).

In the instant case, we are faced with the situation where we could not cure the error on our own motion. The court reporter has stated in her second affidavit that she cannot recall what testimony she read back to the jury; she can only make assumptions based on paper clips she placed on the stenographic tape. Because we are unable to ascertain from the record or the affidavits just what testimony was read to the jury in response to their note, error, if any, has not been preserved for review. The first point of error is overruled.

■ In his eighth point of error the appellant complains that the trial court reversibly erred in failing to answer a written, file-marked communication from the jury, in violation of Article 36.27, V.A.C.C.P. and "due process." Appellant does not

**2.** Now see Tex.R.App. Pro. 55.

allege purposeful wrongdoing on the part of the trial judge, but instead suggests that the jury communication, for some unexplained reason, never reached the judge.

The record shows that there were six notes from the jury filed of record on March 23, 1983. The file stamp on each reveals the time it was submitted and answered. These times were as follows:

| | TIME RECEIVED: | TIME ANSWER RETURNED: |
|---|---|---|
| 1. | 2:45 p.m. | 2:50 p.m. |
| 2. | 2:55 p.m. | 3:00 p.m. |
| 3. | 4:05 p.m. | 4:15 p.m. |
| 4. | 4:50 p.m. | 5:00 p.m. |
| 5. | 4:55 p.m. | answered orally in court |
| 6. | 4:56 p.m. | no record of answer |

It is note number six that appellant complains of herein.

In the communication complained of, the jury requested "the testimony of Barbara Baum and the cab driver concerning words spoken by the complainant or Joe Weaster." Unlike the other five communications, this note was not signed by the jury foreman. The record does not reflect whether the trial judge ever received, acted upon or answered the request. Appellant simply argues that "something intervened" to prevent the trial judge from complying with Article 36.27.

In *Pete v. State*, 533 S.W.2d 808 (Tex.Cr. App.1976), this court faced a similar situation. In *Pete*, the jury had submitted a written request to have the testimony of three witnesses read to them. The record did not reflect whether the trial court ever acted upon or answered the request. This court held that "where procedural requirements do not affirmatively appear in the record to have been violated, a presumption of regularity must prevail." *Pete*, 533 S.W.2d at 811. The burden is on the defendant to overcome this presumption. *Ex parte Stacey*, 709 S.W.2d 185, 189 (Tex.Cr. App.1986).

The appellant contends that his failure to object cannot be dispositive of this point of error because the trial court did not notify him of the jury's written request when it was made. This contention is without merit. See *Pete*, 533 S.W.2d at 812. As in *Pete*, supra, the instant jury communication was on file with the others on the day it was written. The appellant failed to make this complaint at trial or in his motion for new trial. The appellant has failed, therefore, to show this Court any violation of Article 36.27 and has failed to overcome the presumption of regularity in the proceedings. Point of error number eight is overruled.

■■■ In point of error nine, the appellant asserts that the evidence is insufficient to support the jury's affirmative answer to special issue number two, i.e., that he will constitute a continuing threat to society. Article 37.071(b)(2), V.A.C.C.P. The appellant's counsel requested and was denied a charge limiting consideration of extraneous offenses and the appellant's prior criminal record to question number two. However, the trial judge ultimately gave a charge which contained the following limiting instruction:

You are further instructed that if there is any testimony before you in this case regarding the defendant having committed offenses other than the offense alleged against him in the indictment, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then *you may only consider the same in determining the intent of the defendant,* if any, *in connection with the offense,* if any, *alleged against him in the indictment, and for no other purpose.*

(emphasis added).

There was no objection by the State to this instruction. We must presume that the jury conducted itself as directed by the trial court. See *O'Pry v. State*, 642 S.W.2d 748 (Tex.Cr.App.1982). When a portion of the charge unnecessarily increases the prosecutor's burden of proof, he should specially request a charge which correctly allocates the burden placed on him by law. *Ortega v. State*, 668 S.W.2d 701 (Tex.Cr. App.1984) (On Motion for Rehearing). Article 36.15, V.A.C.C.P. states in pertinent part:

Before the court reads his charge to the jury, *counsel on both sides* shall have a

reasonable time to present written instructions and ask that they be given to the jury.

(emphasis added). This article provides the State with the vehicle to make such a request.

The sufficiency of the evidence must be measured by the charge that was given. *Boozer v. State*, 717 S.W.2d 608 (Tex.Cr. App.1984); see *Benson v. State*, 661 S.W. 2d 708 (Tex.Cr.App.1982). Therefore, even though it is permissible, generally, for a jury to consider prior criminal conduct and criminal record in deciding the second punishment issue, see *Keeton v. State*, 724 S.W.2d 58 (Tex.Cr.App.1987) (not yet reported), in the instant case, the jury was instructed not to consider such evidence for any purpose other than the intent of the appellant in connection with the offense alleged in the indictment. Accordingly, we must evaluate the sufficiency of the evidence to support the affirmative answer after excluding the evidence of the extraneous offenses and past convictions.

Excluding from consideration the extraneous offenses and prior convictions, the remaining evidence consists of the facts of the case revealed at the guilt/innocence phase of the trial, the testimony of two Houston police officers who said the appellant's reputation was bad, and the testimony of one police officer who said the appellant was a peaceable and trusted inmate.

"Although this was a senseless murder, that fact is true of every murder in the course of robbery." *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982). However, to support a "yes" answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. Article 37.071(b)(2), supra.

The facts of this case are much less egregious than the facts of *Roney*, supra. In *Roney*, several witnesses testified to statements made by the defendant shortly after the offense. One witness heard the defendant say, "I had to kill the m_____ f_____ before I let him kill me." Another

witness testified that on the afternoon of the next day the defendant suggested that everyone watch the television news and when the defendant saw the report of the story, he laughed. Still another witness testified that the defendant told her that "if the police came to Regina'a [the friend's] house, they better have their insurance policy paid up or he would kill them with the same gun that he killed the [victim] with." *Id.* at 602.

In the instant case, the appellant and Zataraus were apparently "rolling drunks" at nightclubs. After the shooting, the appellant, who was armed, ran when followed by an unarmed woman. Although given ample opportunity, the appellant made no attempt to shoot at his unarmed pursuer. Later, when the appellant was caught near the scene hiding in some bushes, he again made no attempt to shoot at his pursuers.

We find the evidence, viewed in the light most favorable to the verdict and directed by the court's instruction to the jury, insufficient to support the jury's affirmative answer to special issue two. Appellant's ninth point of error is sustained.

In point of error number seven, the appellant alleges that because his trial counsel failed to call five punishment witnesses he was denied effective assistance of counsel at the punishment phase of trial. Because of our disposition of point of error number nine, we need not address this point of error.

 Because we have sustained the appellant's ninth point of error, that the evidence was insufficient to support the jury's answer to special issue two, we reform the sentence from death to life imprisonment. *Roney v. State*, 632 S.W.2d 598, 603 (Tex. Cr.App.1982). The judgment, with punishment reformed to life, is affirmed.

ONION, P.J., dissents.

CLINTON, Judge, concurring.

In *Boozer v. State*, 717 S.W.2d 608 (Tex. Cr.App.1984, 1986), dissenting to denial of State's motion for leave to file motion for rehearing, Presiding Judge Onion wrote an opinion in which three other Judges joined.

At the end he opined that "the right result as reached in *Benson* on original submission ...," *Boozer*, supra, at 621, n. 3. The "result" of the panel decision on original submission in *Benson v. State*, 661 S.W.2d 708 (Tex.Cr.App.1982): "The judgment is reversed and we order entry of a judgment of acquittal." *Id.*, at 711. Let us then revisit *Benson*.

The offense alleged is burglary with "intent to commit the felony offense of retaliation;" the jury was instructed that a person commits the offense of retaliation "if he intentionally or knowingly harms or threatens to harm another by an unlawful act *in retaliation for or on account of the service of another as a WITNESS*." [1] On direct appeal the sole ground presented and decided by the Court panel is sufficiency of evidence to support a verdict of guilty. The parties agreed on essential facts of the matter, *viz:*

> "The only evidence and the only contention by the State as to the intent of the Defendant is that he intended at the time of entry to coerce his ex-wife, Mary Benson, a private citizen, to drop assault charges against him in which she was the complainant."

Writing for a unanimous panel, Judge Odom framed the problem, *viz:*

> "Hence the issue before us is whether one who intends 'to coerce ... a private citizen to drop assault charges pending against him' possesses the required intent to commit the felony offense of retaliation. Stated more narrowly, is this 'private citizen complainant,' who has not testified in any official proceeding, a 'witness' as that term is used in the Retaliation statute, V.T.C.A., Penal Code, Sec. 36.06?"

*Id.*, at 710.

Noting that the Legislature has not defined "witness," and upon analyzing germane related statutes and two prior decisions of the Court [*Ulmer v. State*, 544 S.W.2d 414 (Tex.Cr.App.1976), and *Jones v.*

*State*, 628 S.W.2d 51 (Tex.Cr.App.1981) ], the Court panel held that "under Sec. 36.-06(a), supra, the term 'witness' means "one who *has* testified in an official proceeding," and does not include a mere 'prospective witness.'" *Id.*, at 710–711 (original emphasis by Judge Odom).

Then, the Court concluded:

> "Therefore, we must sustain appellant's contention that evidence adduced at trial was insufficient to show accused possessed the requisite intent to act 'in retaliation for or on account of the services of another *as a witness.*' (Emphasis added.) The complainant, Mary Benson, simply was not, under the facts of this case a *witness* before an official proceeding. [footnote 2 omitted] The record clearly indicates that she was only a *prospective witness* against her ex-husband in a pending assault charge."

*Id.*, at 711.

Thus the decision on original submission turned solely on the circumstance that in its charge the court went beyond indictment allegations and instructed the jury in terms of retaliation on account of service as "a witness." Measuring it by the *charge*, the Court found evidence to be insufficient.[2]

The ultimate result on original submission in *Benson* is the acquittal ordered by the Court panel, and there is no basis for ordering it other than a judicial determination that the requisite implicit finding by the jury that intent of accused was to commit retaliation against Mary Benson on account of her service as a witness was not supported by sufficient evidence. When the panel opinion noted that the alternate theory of "service as an informant" had not been "pursued," it could only mean that the charge had not instructed the jury in that regard.

The opinion stands unerringly for the proposition that sufficiency of evidence to

---

1. All emphasis is mine throughout unless otherwise noted.

2. In its note 2 the Court observed that under the facts appellant "possibly" could have been prosecuted for burglary as alleged in the indictment on the theory that service of Mary Benson was as "an informant" rather than "a witness," but that theory "was not pursued in this case."

support a verdict of guilt must be measured by that authority to find guilt which is bestowed on the jury by a charge of the court. On State's motion for rehearing by a wide majority the Court elaborated on that proposition to conclude "the disposition of this cause made on original submission was correct," *Benson,* supra, at 712.[3]

Though he is among those Judges who joined Presiding Judge Onion in acknowledging the right result was reached in *Benson* on original submission, Judge Davis now dissents here, primarily invoking a enigmatic statement contained in his opinion on an unauthorized State's second motion for rehearing in *Benson,* viz:

"We hold that *when a charge is correct for the theory of the case presented* we review the sufficiency of the evidence in a light most favorable to the verdict by comparing the evidence to the indictment *as incorporated into the charge.*"

661 S.W.2d, at 715 (latter emphasis by Judge Davis).[4]

---

**3.** After noting that the State failed to lodge any objection to the court's charge or to request the critical part of the charge be amended to embrace the theory of "retaliation" that party *now contends* was "the only one supported by the evidence," and thus "acquiesced at trial to the court's unnecessary limitation of the legal theory in issue, to one which was not established by that party's evidence," and holding that the State "may not avoid the consequences of its lapse under the circumstances presented," the Court restated the rule applied by the Court panel on original submission, *viz:*

> "Because a verdict of 'guilty' necessarily means the jury has found evidence of that on which it was authorized to convict, the *evidence* is measured by the *charge* which perforce comprehends the indictment allegations. [footnote omitted]. It follows that if it does not conform to the charge, it is insufficient as a matter of law to support the only verdict authorized."

*Ibid.* (Original emphasis by the Court). We also found that given the court's charge, "the only verdict authorized in view of the evidence was 'not guilty,'" and that, nevertheless, the State was now seeking "an opportunity to correct the omission in the trial court's charge upon a retrial." We concluded, however, that "the State may not do on motion for rehearing what the Constitution and laws of this State prohibit it from doing upon the return of a 'not guilty' verdict." *Ibid.*

**4.** Recently in *Fain v. State,* 725 S.W.2d 200 (Tex. Cr.App.1986), I confessed to an uncertainty as to intendment of the above language relied on by the majority in *Fain, id.,* at 203. It has not been clarified by Judge Davis in his dissent today.

How may "theory of the case presented" be identified? Issues in a criminal prosecution, as in any litigation in a court of law, are those tendered by pleadings and raised by evidence. In *Benson,* the indictment is mute as to any "service of another as a public servant, witness, or informant;" because the statute requires a kind of such service, inferentially it may be said that allegations in the indictment tendered an issue of whether Mary Benson rendered service in one or the other capacity. However, the evidence did not raise an issue that her capacity was that of "one who has testified in an official proceeding;" rather, under the facts accused "possibly" could have been prosecuted on the theory that Mary Benson rendered service as an informant, but was not.

So what theory of the case was presented? On original submission it was decided, and also on rehearing we held as a matter of law, the evidence did not present the theory upon which the trial court instructed the jury. It follows, therefore, contrary to the opinion on second motion for rehearing, that the charge was not correct for the theory of the case insofar as it authorized the jury to find Mary Benson was a witness, and on that basis to convict her exhusband.

Judge Davis stated, "The charge together with the proof and the indictment reflects the State's theory of the offense." *Benson,* supra, at 715. But then he opined, "It appeared to all intents and purposes that the State's theory of retaliation involved a 'witness'." However, any such appearance flies in the face of the evidence and law that should have been taken into account by the trial court in drafting its charge. Indeed, on original submission the Court panel suggested that "possibly" the only "correct" theory was that she was an informant.

In its first motion for rehearing the State seized on that suggestion and sought to make that theory, contending evidence was adequate to support the *indictment* allegation of intent to commit the offense of retaliation, so long as the general term is narrowed to the alternative theory that the intended victim is an "informant" rather than a "witness;" thus, it argued the charge was erroneous and therefore constituted only "trial error." We ultimately concluded there was "no 'trial error' of which the State may at this point in the process avail itself to the end of a more desirable result ...," *Benson,* at 712.

The State's "fundamental premise" basing identical contentions in its second motion for rehearing was rejected by the Court, *Benson,* at 714, albeit from a perspective that the charge was "correct," *id.,* at 715. However, as demonstrated above, in law and fact it was not. Moreover, as pointed out in my opinion in *Fain,* supra, "[T]he Court appears to have since aban-

With those observations I join the opinion of the Court sustaining point of error nine and otherwise join the judgment of the Court.

W.C. DAVIS, Judge, dissenting.

Today the majority incorrectly relies upon *Benson v. State*, 661 S.W.2d 708 (Tex. Cr.App. 1982) and *Boozer v. State*, 717 S.W.2d 608 (Tex.Cr.App.1984) in determining the sufficiency of evidence to support the affirmative finding on special issue Number Two. See also *Ortega v. State*, 668 S.W.2d 701 (Tex.Cr.App.1983). Without analysis, the standard first employed in *Benson*, supra, is today extended from use in the guilt-innocence phase of a lesser felony case to the punishment phase of a capital murder.

In *Benson*, supra, a majority of this Court found the State had failed to prove its theory of retaliation involving a "witness." Although the charging instrument in *Benson*, supra, simply alleged the defendant had the intent to commit the offense of retaliation, the charge properly, if incompletely, and without objection, informed the jury that retaliation is committed where a *witness* is knowingly threatened or harmed. In other words, the trial court's charge unnecessarily restricted the jury's consideration to the complainant's role as a *testifying* witness. See and cf. *Jones v. State*, 628 S.W.2d 51 (Tex.Cr.App. 1980), rather than charging the jury that the general allegation of "retaliation" in the indictment would include retaliation against a witness, *informant* or public servant. Once incorporated into the charge, and the instruction being proper if restrictive, the State was bound to the higher level of proof required by the instruction. We analogized the situation in *Benson*, supra, with a situation in which a proper indictment alleges the elements of burglary and alleges the intent element as "intent to commit theft". We stated:

Since a jury charge authorizing the conviction must require the jury to find all the elements of the offense, (citations omitted) and theft has several different sets of possible elements, the charge must set out one of those sets of theft elements. (citations omitted). If the State fails to object to a charge that defines theft in terms of elements of receiving stolen property and the evidence shows an unlawful appropriation from the owner, the conviction should be reversed for insufficient evidence if a jury convicts under such a charge. The *only possible* interpretation of the indictment and charge is that the State's theory is burglary with intent to commit theft—theft by receiving stolen property. Therefore, in viewing the evidence in terms of a proper charge incorporating the indictment, a reviewing court would be bound to find the evidence insufficient as a matter of law. (emphasis in original)

Two matters of interest to the present case can be gleaned from *Benson*. First, the charge must be a *correct* instruction. Second, the standard of review specifically applies to the initial trial phase. In *Benson*, supra, we held that "when a charge is correct for the theory of the case presented we review the sufficiency of the evidence in a light most favorable to the verdict by comparing the evidence to the indictment *as incorporated into the charge.*" (emphasis in original)

In *Boozer*, supra, a plurality of this Court again found the evidence insufficient as measured by the *charge* given at guilt-innocence. See also *Ortega v. State*, supra. Overlooking one predicate to *Benson* analysis—the *correctness* of the charge—the plurality opinion in *Boozer* stated that it is not the correctness of a charge but simply whether the evidence is sufficient measured by *whatever* charge is given. *Benson* is then bootstrapped as authority for this proposition.

I authored *Benson* but disagreed with Judge Clinton's interpretation of that opinion in *Boozer*, joining Judge McCormick's

doned that particular prerequisite to measuring sufficiency of the evidence according to the

charge," *id.,* at 204.

dissent in the latter case, especially in his discussion of trial error and its ramifications. That position remains constant here. I also disagree with the apparent willingness of a plurality of the Court to eliminate the consideration of an indictment allegation in sufficiency analysis, for it is in a charging instrument that the state's "theory of the case" is first presented, and it is only in the incorporation of the indictment allegations in the charge that a *Benson* sufficiency analysis gains credence.

In *Fain v. State*, 725 S.W.2d 200 (Tex.Cr. App.1986) a case not cited by the majority today, the issue presented was much closer to the instant case in that appellant Fain was complaining that the evidence was insufficient to support the finding of "true" to an enhancement count at the punishment phase. The appeals court found that a mechanical error had occurred which "did not comport with the indictment, the evidence or common sense" and treated that appellant's claim of insufficiency as a jury charge error. *Fain v. State*, 688 S.W.2d 235, 238 (Tex.App. 8th District 1985). Because the appellant did not object to the charge at trial, the appeals court analyzed the case according to the requirements of *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr. App.1984) (opinion on State's motion for rehearing) and found that the error did not require reversal.

In *Fain*, as here, the instruction was incorrect "for the theory of the case presented." See *Benson*, supra. We first noted that in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court made clear that its "rational trier of fact" standard for review of evidentiary sufficiency assumes first, that the trier of fact has been properly instructed and second, whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. Looking at the claim in *Fain*, we said that appellant's claim as presented did not constitute a valid claim of insufficient evidence and concluded that the Court of Appeals did not err in addressing instead the predicate claim of jury charge error. *Fain v. State*, supra, at 202.

Here, appellant's claim of insufficiency is also predicated upon jury charge error, the error apparent both by the denial of appellant's own similar requested charge and from the usual and technical usage of the charge at the guilt-innocence phase of trial rather than at the punishment phase of trial as it appeared here. Under the standard enunciated in *Almanza v. State*, supra, proper analysis would result in a finding by this Court that appellant was not harmed. Just as we decided in *Fain*, supra, that the jury there "could not have both believed the evidence of the prior convictions and their commission, and, at the same time, have found that the second offense was not committed after the first became final," even though they were so instructed, here the jury could not have both believed the evidence of appellant's prior extraneous offense and found those offenses probative of appellant's future dangerousness, and simultaneously, have found those offenses to be merely probative of appellant's intent to commit the underlying offense of which they had *already* found him guilty. Both instructions effectively asked the respective juries to do the impossible, here being to only view extraneous offenses to determine intent to commit an offense, *"if any."* The fact that the offense had been committed by appellant was already decided by the verdict of guilt. The instruction incorrectly implied the jury was to re-examine this finding.

The undisputed evidence, brought and discussed before the jury by both parties, showed that appellant had a long history of prior criminal offenses, some more than adequately demonstrating appellant's violent tendencies and attitudes. The jury could not have both taken into consideration the evidence of appellant's priors to determine an affirmative response to the second special issue and also followed the instruction as given, since the determination of guilt had already been made. Given the totality of evidence shown, appellant cannot be said to have been harmed. See *Fain v. State*, supra.

In the alternative, should the Court decide to attempt application of the *Benson* standard without a reference to the indict-

ment and instead using the special issues submitted as the basis for incorporation of the charge, a determination must first be made as to the correctness of the charge. See *Benson v. State,* supra. If the charge is correct but also unnecessarily restrictive, increasing or changing the State's burden of proof without objection, the State may be held to that burden at either phase of trial under a *Benson* analysis, but *Benson* and its progeny should not be authoritative where a patently *incorrect* charge is given *sans* objection, especially where the trial court has previously denied a defendant's requested instruction covering essentially the same matter and where both State and defense attorneys have discussed a defendant's prior extraneous offenses and/or conduct during final argument before the jury without objection. An instruction such as the one given here, viewed in light of its boilerplate source,[1] was incorrect, both in substance and application, but apparently had no effect on either party or the jury. Given defense counsel's action in ignoring the charge and discussing the priors, I would hold that appellant has waived any claim of insufficiency based upon the incorrect charge.

All the above is based upon the perception that the instruction was *wholly* improper and incorrect, and that the majority today, without analysis, applies the *Benson* line of cases to a factual context distinguishable by form and trial order. However, a second perception is also viable. The instruction, read literally, charges the jury that it may consider extraneous matters only to the extent the matters impact on the intent of appellant *"in connection* with the offense." Legalistically, our immediate reaction is that the instruction, commonly given at guilt-innocence, has no place at the punishment phase. But what does that phrase "in connection with the offense" mean, not to this Court as ex post facto reviewer, but to the jury as trier of fact? I submit that the instruction as written allowed the jury, at the least, to review appellant's conduct immediately prior to

committing the instant capital offense, in a broader sense by gauging the appellant's intent on the night in question vis-a-vis his propensity for future violence. It is a given that the jury may review the circumstances of the capital offense itself in determining a proper response to special issue two. *Keeton v. State,* 724 S.W.2d 58 (Tex.Cr.App.1987); *Santana v. State,* 714 S.W.2d 1 (Tex.Cr.App.1986) and cases cited therein. Premeditation, calculation, mode and manner of the killer's conduct showing planning and aforethought play a role in the decision and each factor relates to the intent of this appellant in connection with the capital offense. See *Landry v. State,* 706 S.W.2d 105 (Tex.Cr.App.1985); *Demouchette v. State,* 591 S.W.2d 488 (Tex.Cr. App.1979). From the record it is clear that appellant was in the process of "rolling drunks" in a certain area of town. Before assaulting and robbing the deceased and his companion, appellant had terrorized the Flading brothers, kidnapping them at gunpoint from another bar in the area, driving them to a more remote scene and robbing them. More than once appellant put the brothers in fear for their lives by shoving a gun in their faces and threatening to kill them. A short time after the brothers ran away, after being robbed, appellant drove back to the same area where he had accosted the Flading brothers, chose another bar, and entered the altercation with Reed and Weaster. Appellant left but returned to the victim's car after apparently procuring a pistol from his own vehicle. The killing of one of two victims followed.

The prior incident involving the Flading brothers underscores appellant's intent "in connection with" the capital offense. Appellant was out with an accomplice on the night in question to rob and terrorize. The prior incident demonstrates an ongoing and not isolated course of conduct, which in turn evinces appellant's future dangerousness. The intent "in connection with" the capital offense here shows a repeat performance with same motive and more violent result. It was not appellant's intent *to commit* the offense that was at issue; the

---

**1.** Examination of various resource materials brought to light the source, if not the puzzling rationale, for the instruction in question. The

instruction was taken verbatim, except for three words, from the McClung's *Jury Charges for Texas Criminal Practice* (1985 ed).

jury had already decided that question at guilt-innocence. Rather, it was his intent "in connection with" the offense as shown by the premeditated and calculated acts prior to and during the charged conduct that we must be concerned with today. Those acts, demonstrating appellant's design and determination, his state of mind in connection with the capital offense, are circumstances which were properly before the jury even with the restrictive and improper instruction.

I would also include the pen packets describing appellant's prior aggravated violent conduct as evidence properly before the jury. This non-testimonial, physical evidence admitted without objection and discussed by both sides during closing arguments was not excluded from purview by the limiting instruction, although any testimony relating to the packets could not be considered. Since there was no objection to the records themselves and because the appellant, through his attorney, acknowledged the offenses, we are not concerned with *how* appellant was connected to the packets or whether such connecting testimony was excluded through the limiting instruction.

Lastly, I disagree with the majority attempting to turn appellant's subsequent conduct into "mitigating" evidence to support reformation of a just sentence. The fact that an individual hides from his pursuers or fails to violently confront the police when arrest is attempted is no mitigation of the heineous conduct already perpetrated. I also believe that *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982) is distinguished on its facts and that appellant, while perhaps demonstrating an attitudinal coarseness toward the offense, in no way approaches the cold and calculated violent conduct perpetrated by appellant Marras on several individuals that evening in question.

For these reasons, I respectfully dissent.

McCORMICK and WHITE, JJ., join.