Sammie **FELDER**, Jr., Appellant,

v.

The **STATE of Texas**, Appellee.

No. 69731.

Court of Criminal Appeals of Texas, En Banc.

Sept. 14, 1988.

Rehearing Denied Oct. 19, 1988.

Wayne T. Hill, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., William J. Delmore, III and Brian Rains, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for capital murder, V.T.C.A., Penal Code Sec. 19.03(a)(2). Following affirmative findings by the jury to special issues numbers one and two submitted pursuant to Article 37.-071(b)(1) and (2), V.A.C.C.P., the court, in accordance with the law, assessed punishment at death.

At appellant's first trial in 1976, appellant was also convicted of capital murder, and his punishment was assessed at death. On appeal, his conviction was affirmed, *Felder v. State,* 564 S.W.2d 776 (Tex.Cr. App.1978).[1] After remand of federal habeas corpus proceedings to the United States District Court for the Southern District of Texas, 693 F.2d 549 (5th Cir.1982), the district judge, Hon. Ross N. Sterling, denied the habeas petition and Felder appealed. A panel of the Fifth Circuit Court of Appeals reversed, holding that Felder's Sixth Amendment right to counsel was violated by admission into evidence at his State's

---

1. Felder's petition for certiorari was denied. *Felder v. Texas,* 440 U.S. 950, 99 S.Ct. 1433, 59 L.Ed.2d 640 (1979). His subsequent state petitions for writ of habeas corpus were denied. Felder then proceeded to invoke federal habeas corpus jurisdiction.

trial of a confession elicited by police questioning in counsel's absence, after counsel had directed the police not to interrogate Felder in absence of counsel, and that the admission of the confession elicited by this violation was not harmless error. The order of reversal included a remand to the federal district court to issue a writ of habeas corpus ordering Felder released unless the State commenced a new trial within 90 days of the mandate of the Fifth Circuit Court of Appeals. *Felder v. McCotter*, 765 F.2d 1245 (5th Cir.1985).

In his present appeal from his 1986 conviction, appellant raises sixteen points of error, one of which challenges the sufficiency of the evidence to support the affirmative finding by the jury to special issue number two submitted under Article 37.071, supra.

At the outset we are confronted with two points of error relating to voir dire examination that present the most serious questions in the case.

■ Appellant contends in his sixth point of error that the trial court erred in failing to sustain his challenge for cause to prospective juror Martin Johnson because he clearly indicated that parole would be a deciding factor in answering special issue number two at the penalty stage of the trial despite his oath as a juror and the court's instructions not to consider parole for any purpose, and even though the matter of parole would not be in evidence. Appellant also points out that for the foregoing reasons, Johnson indicated he could not take the oath as a juror.

Article 35.22, V.A.C.C.P., provides:

"When a jury has been selected, the following oath shall be administered them by the court or under its direction: 'You and each of you do solemnly swear that in the case of the State of Texas against the defendant, you will a true verdict render *according to the law and the evidence*, so help you God.'" (Emphasis supplied.)

The matter of parole is not a proper consideration for jury deliberation on punishment in a capital murder trial or any other trial. *White v. State*, 629 S.W.2d 701 (Tex.Cr.

App.1981), cert. denied, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982); *O'Bryan v. State*, 591 S.W.2d 464, 478 (Tex.Cr.App. 1979), cert. denied, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980).

And it has been said that under Texas law a jury may not consider the possibility of parole in its deliberations on punishment. *O'Bryan v. Estelle*, 714 F.2d 365 (5th Cir.1983), cert. denied, 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984), citing *Moore v. State*, 535 S.W.2d 357 (Tex.Cr. App.1976).

This is so because parole is a matter within the exclusive jurisdiction of the Board of Pardon and Paroles and, as such, is not a matter of concern for the jury. *Haliburton v. State*, 578 S.W.2d 726 (Tex. Cr.App.1979).

And the jury, in determining punishment to be assessed in a felony case, is not authorized to resort to or apply the parole law. *Graham v. State*, 422 S.W.2d 922 (Tex.Cr.App.1968); *Pennington v. State*, 364 S.W.2d 376 (Tex.Cr.App.1962).

The State points out in its brief that jury consideration of the "existence of the parole law and good conduct time" is now expressly authorized in non-capital cases, citing Article 37.07, Sec. 4, V.A.C.C.P. This statutory provision, of course, has no application to capital cases, and since the writing of the State's brief it has been declared unconstitutional. *Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App.1988).

While it is common knowledge that from time to time inmates of the Texas Department of Corrections are released on parole, *Taylor v. State*, 420 S.W.2d 601 (Tex.Cr. App.1967); *Austin v. State*, 531 S.W.2d 615, 618 (Tex.Cr.App.1975); *Sneed v. State*, 670 S.W.2d 262 (Tex.Cr.App.1984), parole should not be considered by the jurors in determining punishment.

■ It should be kept in mind that Article 35.16(c)(2), V.A.C.C.P., authorizes the trial court to exclude on a defendant's challenge for cause any prospective juror who has a bias against any law upon which the defendant is entitled to rely.

In his voir dire examination of prospective juror Johnson, appellant's counsel discussed with him special issue number 2 under Article 37.071, V.A.C.C.P., and more particularly, criminal acts of violence. Johnson agreed that "a fight at the ice house on Friday night" might be a criminal act of violence but not a threat to society. Appellant's counsel sought to determine if the juror could distinguish between violent and non-violent acts and asked:

"... In other words if a person had been convicted and sent to the penitentiary say three times once for possession of marijuana, once for auto theft, once for burglary, would that be a different set of facts to predict his future criminal acts of violence, that if he had been convicted of say a crime of a serious threat to take life?

"A. To me they would both be the same. If he has a previous record that had called for him to be sent to the penitentiary and he hadn't rehabilitated that he would still go out and then in an act of robbery took somebody's life, to me hasn't learned his lesson from the time he was in the penitentiary before that even after this one he has no regards for his fellow human being's rights and more than likely he would if released something in the future commit the same acts again.

\* \* \* \* \* \*

"A. That would be my opinion, yes, that if he has done it before and has done time in the penitentiary and was released and did it again, you know he's like a yo-yo. He's still going to go up and down. He hasn't learned from the time he spent in the penitentiary. 'Hey, I can't violate other people's rights without having my right of freedom taken away from me.'

\* \* \* \* \* \*

"A. If he has been to the penitentiary, if he has been to jail three different times, you know he's there. He's freed, he goes back, he's freed, he goes back and he's freed again and if he does a crime how many chances does the guy expect us to give him to violate some-body's rights? *To me if he has been there once and if he goes back a second time to me, society should write him off.* He hasn't learned that you can't continue to violate other people's rights and not, you know, if you're going to dance you've got to pay the band." (Emphasis supplied.)

When asked, the prospective juror answered that if an individual goes to the penitentiary three times, there is a 99 percent chance he would steal again. When asked if theft was "going to be a criminal act of violence that would constitute a continuing threat to society and if theft would prove to him beyond a reasonable doubt that special issue number two should be answered yes, the prospective juror replied:

"A. Since he had been to the penitentiary before several times and now that he has been released—he, this may have been the first time he has committed a violent criminal act. He has no respect for other people's rights, for other people's life that he would not give it a second thought to doing it again.

"Q. Because he has committed non-violent crimes?

"A. Well, no because he had committed non-violent crimes and went to jail three different times so he's finally committed a violent crime that *there is no guarantee that could be given to me to convince me that if released he would not commit a violent act again.*

\* \* \* \* \* \*

"A. But if the guy has been in jail three times and he has gotten through his skull 'Hey, I can't do this,' what makes you think that the fourth time is going to convince him that 'Hey, I can't do this and not be punished?'

"Q. Well, if you answer both of those questions yes, the punishment is going to be death, isn't it?

"A. Yes.

"Q. If you answer one of them [special issues] no, the punishment is going to be life in the penitentiary.

"A. Right, but even with the life sentence after a number of years can't you come up for parole?

"Q. The Judge will instruct you that you're not to consider that and you can't do that, not consider that for any purpose when you're answering issue number one and number two.

"A. To be honest with you if I knew for a fact that he had been in several times before and had been released and he was continuing to commit criminal acts and the last one was violent I don't think that I could not believe that he would do it again, if given the chance.

\*    \*    \*    \*    \*    \*

"Q. And if he had done three or four [convictions] before then you feel like that eventually he would be a threat to the free society?

"A. *If he was given just one life sentence* and then eventually could work his way to parole.

"Q. Right. Right, so if he was given a life sentence which means you would answer one of those questions no.

"A. Right.

"Q. Would it prevent you from answering one of those questions no, because of the fact you would be afraid he would get out of the penitentiary and be a threat to the free society?

"A. That would be one of my considerations ... I have to look at the long range situation that he may not be a threat to the prison society but if he's given a life sentence and in twenty years he gets paroled and he's back into the free society at that time will he be a threat to the free society.

"Q. Now let me ask you this, if the court told you as a juror that it is not your business as a juror to consider pardon and parole, that is exclusively within the jurisdiction of the pardon and parole board of the State of Texas, could you not consider the fact that he might some day be out in free society?

"A. If the court was to so instruct me that in issue two the society that he was talking about was only the prison society and not the free society and to only look

is there is a probability that he would commit a criminal act in the prison society then I wouldn't consider the parole.

"Q. That's not what I asked you though. If the court instructed you that in determining issue number one and number two, you are not to consider any possibility of parole or pardon, that that function is strictly within the jurisdiction of the Board of Pardons and Paroles, could you follow that instruction and not consider what might happen twenty years from now by the pardon and parole board?

"A. I would try my best.

"Q. We're asking you some tough questions. This is a tough question.

"A. Yeah, I know.

\*    \*    \*    \*    \*    \*

"Q. ... are you telling me that in answering issue number two that the fact that the person may be paroled some day down the road will have no affect on you in answering that question absolutely?

"A. If so instructed by the court, I would, to the best of my ability, not try to let that influence my decision.

"Q. Well, as the Judge has said, you can't get away with that. You're right you have to say yes or no.... So now is the time to tell us. The fact that he may be out in society again would that influence your decision on issue number two?

"A. *I'd have to say yes.*

\*    \*    \*    \*    \*    \*

"Q. So are you telling me that if the Judge instructs you that you are not to consider pardon or parole for any purpose, that's strictly within the jurisdiction of the Board of Pardons and Paroles that you couldn't follow the law?

"A. Deep down I say I would try to the best of my ability but more than likely the thought of the *possible parole* in the future, be it five years or twenty years would be in my mind and that *would probably influence my decision.*

"Q. *Best of your ability and probability is not going to get it.*

"A. *Well, I'd have to say yes it would.*

"Q. You're saying yes it would even though you were instructed that it shouldn't?

"A. You know I say to the best of my ability but you know you're asking me to reach down and give you a yes or a no answer *and in reaching down I would have to give you a yes answer trying to be completely honest with you.*

\* \* \* \* \* \*

"Q. That it would influence you?

"A. Yes, I would try to the best of my ability but chances are *that could come down to be the deciding factor.*

"Q. At this point you feel like parole would influence your decision?

"A. The possibility of parole, yes, if he was a repeat offender that he had been into the penitentiary several times before." (Emphasis supplied.)

At this time, appellant challenged the prospective juror Johnson for cause and the challenge was overruled. The voir dire interrogation continued along the same line with much the same answers. The record then reflects:

"A. Is the question that you're asking if at no time the subject of parole is entered into the evidence.

"Q. And it won't be.

"A. That will I take that possibility even though it has not been entered into the evidence and use that in my decision; is that the question that you're trying to get me to answer?

"Q. Number one, it won't be in evidence and the Judge will instruct you that being the law of this case that you're not to consider. But you're saying that it would possibly influence your decision so you see you would be influenced by something that is not in evidence.

"A. I still want to use that phrase to the best of my ability but you don't want me to use that.

"Q. ... can you honestly take that oath the way you feel?

"A. *I could honestly take the oath that I would use only the testimony and the evidence that is brought forward and using that to make my decision. I feel that I can take that oath and to the best of my ability I would.*

"Q. And not consider parole for any purpose because it's not in evidence and you know you don't have to take that oath. The law doesn't ever require you to take an oath that you can't follow.

"A. I want to say no but yet in my mind *that thought would still stick with me even though it had been entered into evidence.*

"Q. It had not been entered into evidence?

"A. *It had not been entered into evidence and you're wanting me to be honest with you.*

"Q. And with yourself.

"A. And with myself and I don't think I could not have that—it may just be a little bit of influence in that *if if was real close that could be the decision factor.*

"Q. And *do you agree with me that if that was the deciding factor you wouldn't be following your oath?*

"A. Yes, sir, I do.

"Q. Okay, *then could you take it [oath]* knowing that even though the law doesn't require it?

"A. *No, I don't think I could. ...* and *I can't say honestly that no that would not enter into my decision process* because there's a possibility that it may. To the best of my ability I would not let it, but you have to have a yes or a no." (Emphasis supplied.)

At this point the court sua sponte terminated the interrogation and would not allow appellant's counsel to ask further questions, noting that the interrogation had consumed an hour and a half. At this time appellant again challenged for cause pointing out that the prospective juror could not take the oath to follow the law and the evidence. The challenge was overruled, at which time appellant immediately exercised a peremptory challenge. The State at no

time attempted to rehabilitate the prospective juror.

Thereafter appellant exhausted his peremptory challenges, the court refused to grant him additional peremptory challenges, and appellant claims he was forced to accept as a juror, Ernie Feille, who was an "objectionable juror", which he would not have had to accept if the trial court had not erred in refusing to grant his challenge for cause.

The conduct of the voir dire examination rests largely within the sound discretion of the trial court. *Weaver v. State*, 476 S.W. 2d 326 (Tex.Cr.App.1972); *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984). *See also, Patterson v. State*, 598 S.W.2d 265 (Tex.Cr.App.1980). *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976), cert. denied 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266; *Abron v. State*, 523 S.W.2d 405 (Tex.Cr. App.1975).

In evaluating a prospective juror's response, we recognize that we are faced with a cold record and we, therefore, give deference to the trial judge who was in a position to hear and see the potential juror. *McCoy v. State*, 713 S.W.2d 940, 945 (Tex. Cr.App.1986) and cases there cited including *Bird v. State*, 692 S.W.2d 65 (Tex.Cr. App.1985). We must examine the record as a whole to determine whether the prospective juror was truly disqualified and assay the voir dire examination with deference to the trial court and its ruling. *Brandley v. State*, 691 S.W.2d 699 (Tex.Cr. App.1985).

The overall picture presented by the voir dire examination of Johnson is one of a person entertaining strong convictions, who candidly made clear that, in determining as an answer to special issue number two under Article 37.071, supra, the possibility of parole could be the deciding factor, and was a matter which he could not honestly say that he would put completely out of his mind, despite his oath as a juror and the court's instruction not to consider the same.

He did say several times that he would try to the best of his ability to follow the oath and the court's instructions not to consider the same, but these statements were inapposite to his earlier, as well as concluding, statements noted above. The fact that a prospective juror states that he would answer the punishment questions truthfully to the best of his knowledge is not sufficient to prevent his disqualifications where the voir dire examination, considered as a whole, discloses strong feelings which would prevent him from abiding by existing law or fairly considering the evidence as adduced. *Vigneault v. State*, 600 S.W.2d 318 (Tex.Cr.App.1980). *See also, Cuevas v. State*, 575 S.W.2d 543 (Tex. Cr.App.1978).

In the instant case, just before the court terminated the voir dire examination, Johnson clearly indicated he could not take the oath or honestly say that parole would not enter into the process of answering special issue number two. The then urged challenge for cause was overruled.

It has been said that if a potential juror is unable to disregard an unlawfully obtained confession, he would be subject to exclusion upon proper challenge. *Barney v. State*, 698 S.W.2d 114 (Tex.Cr.App.1985); *Pierce v. State*, 696 S.W.2d 899 (Tex.Cr. App.1985). Likewise, if a potential juror is unable to disregard parole in determining the issues as to punishment and unable to take the oath of a juror, he is subject to exclusion upon proper challenge. *See* and cf. *Ellis v. State*, 726 S.W.2d 39, 44 (Tex. Cr.App.1986); *Mann v. State*, 718 S.W.2d 741, 748 (Tex.Cr.App.1986). The objection of a voir dire examination of prospective jurors is to cause to be assembled a competent, fair, impartial and unprejudiced jury to judge the facts of the case. *Yanez v. State*, 677 S.W.2d 62 (Tex.Cr.App.1984). We conclude, with due deference to the trial court, that it erred in overruling the challenge for cause under Article 35.-16(c)(2), V.A.C.C.P.

To preserve reversible error in regard to the denial of a defendant's challenge to a prospective juror for cause, the defendant must show that he has been forced to exercise a peremptory challenge to excuse the prospective juror to whom

the defendant's challenge for cause should have been sustained, and that he has exhausted all his peremptory challenges and he had later been forced to accept a juror whom he found objectionable. *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979), cert. denied 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980); *Barrow v. State*, 688 S.W.2d 860, 866 (Tex.Cr.App.1985); *Bell v. State*, 724 S.W.2d 780, 795 (Tex.Cr.App. 1986). *See also, Wolfe v. State*, 147 Tex. Cr.R. 62, 178 S.W.2d 274 (1944); *Hernandez v. State*, 563 S.W.2d 947, 948 (Tex.Cr. App.1978).

As noted earlier, appellant exhausted his peremptory challenges, had his requests for additional peremptory challenges denied, although the ruling as to the above challenge for cause was called to the court's attention, and the twelfth juror chosen was deemed "objectionable" by appellant and this was pointed out to the court. The error was preserved, and this cause must be reversed for this error alone.

Next we turn to appellant's third point of error that the trial court erred in overruling his challenge for cause of prospective juror Roger Stamford. He claims Stamford manifested an inability, after finding an accused guilty of "intentional" capital murder, to reassess or reconsider the evidence offered at the guilt stage for the trial, for whatever probative value it would have in answering the first special issue at the penalty stage of the trial—"whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; ..." Appellant urges that the prospective juror equated the statutory meaning of "intentionally" (V.T.C.A., Penal Code Sec. 6.03) with "deliberately" (not defined in the statute) and as used in Article 37.071(b)(1), supra, and could not conceive of a situation where, if an accused was found guilty of intentionally committed capital murder, he would not answer the first special issue "yes". This, the appellant argues, would relieve the State of its burden of proof on said special issue, and would constitute a bias against

the law on which he is entitled to rely. See Article 35.16(c)(2), V.A.C.C.P.

The prosecutor began voir dire interrogation of the prospective juror Stamford on this issue as follows:

"Q. ... When it came to issue number one it's very likely that you would use the very same evidence that you found a person guilty with and apply it to issue number one. Does that make sense to you?

"A. Yes, sir.

"Q. Because in the first part of the trial you have found someone guilty· of intentionally causing someone's death by doing something. *Simply because they've been found guilty doesn't automatically answer special issue number one yes. It may answer yes based upon that evidence if you analyze it and it convinces you that it's yes.*

"When you're given the special issues you're not going to be given any definitions so I think the key in number one is probably deliberately. So I ask you *what does that mean to you when you look at the issue and being convinced someone's conduct was done deliberately to cause someone's death?*

"A. *That they intentionally did it.*

"Q. So intentionally and deliberately you're using in the same breath. There's nothing wrong with that because again the legislature has never defined deliberately. So it stands to reason that it could be intentionally, it could mean that he meant to do it, that they thought about it and did it, done on purpose. Whatever it means to you and eleven other people. *But again it takes a separate decision even though now you found that they intentionally caused someone's death.* You have to look at the evidence and it involves a separate distinction. You have to say yes, I know I found him guilty but now does it convince me deliberately did it." (Emphasis supplied.)

The prosecutor then sought to provide the venireman with an example to illustrate when a capital murder defendant might be found to have acted "intentionally" at the

guilt stage of the trial, but still be found to have not acted "deliberately" in answer to the first punishment special issue.

"Q. Let me see if I can give you an example. Going back to the 7–11 situation, the robber goes in there and in the course of the robbery they fire a gun and it ricochets from the floor into the person or they fire a shot into the ceiling and it ricochets down. *They have intentionally done something to cause someone's death. But now was their conduct deliberately done to cause the death. Do you see a distinction there* or go even further if you shoot someone in the leg, is there a reasonable expectation that death is going to occur? Do you feel that there is?

"A. No.

"Q. Some people take the position that I don't care where you shoot somebody there's going to be a reasonable expectation of death occurring. Again, if they feel that way it's fine but I guess you have to look at the totality of the circumstances to see actually how somebody went into a robbery situation and killed somebody. Did they fire one shot or six shots? Did they kill somebody by shooting them in the heart or shooting them in the leg? There should be a distinction as far as issue number one is concerned. And again simply because they've been found guilty of capital murder it may not answer the issue yes. Do you have any questions about number one?

"A. No.

"Q. *So you see yourself as being able to answer the special issue no again, if you're not convinced beyond a reasonable doubt that the issue is yes?*

"A. *That's correct.*

"Q. *Even though now you've found somebody guilty of capital murder.*

"A. *Correct.*" (Emphasis supplied.)

Later in the voir dire, the following colloquy occurred between appellant's counsel and Stamford:

"A. You'll never get the question number one and number two unless you have found the defendant guilty of capi-tal murder. You understand that don't you?

"A. Yes.

"Q. And one of what we call the culpable mental state which means that you have—the mental state you have to be guilty of capital murder is intentionally and knowingly. Person acted intentionally and knowingly and a person acts intentionally when it is his conscientious [sic] objective or desire to engage in the conduct or cause the result. That's the legal definition of intentional.

"A. Would you read it again.

"Q. A person acts intentionally when it is his conscience [sic] objective or desire to engage in the conduct or cause the result. That's his conscious desire to engage in the conduct or cause a result.

"You have already been convinced beyond a reasonable doubt that the defendant acted intentionally or you would never get to question number one. *Now look at question number one and put a period behind deliberately and answer this question. Would you always answer that question yes after you have found a person intentionally acted?*

"A. *I think so.*

"Q. You think you would. So what you're saying is that if once you find someone guilty of capital murder then in all cases you would answer with a period at deliberately issue number one yes no matter what the evidence is?

"A. I don't—as I understood it there are two separate trials, basically. If you answer the first one and I don't know that there couldn't be some evidence in the second trial that maybe would convince me that the answer to the first part of that was no.

"Q. You think that even though you had answered the first part of it intentionally as I read the definition to you, some other evidence could convince you that he did not act deliberately?

"A. I really—I can't conceive of anything that the answer to the first part of that wouldn't be yes if you had already proved it in the first part.

"Q. If you had already proved the intentional part?

"A. Yes.

"Q. So we'll be sure here when you find a person guilty of capital murder and by its very nature you have to answer the question beyond a reasonable doubt that he acted intentionally. It is my understanding you would always answer issue number one, down at least to deliberate, yes?

"MR. RAINS: I object to the first of the question because the qualification of the juror speaks to the entire issue and just doesn't narrow the inquiry as to what you would do if the question ended in the word deliberately. That makes no sense because that's not the issue that we're dealing with in this case.

"THE COURT: Sustained.

"Q. Look at the whole of issue number one and take the period out of deliberately. *If you believe beyond a reasonable doubt that a person had intentionally killed someone would you automatically answer issue number one yes?*

"A. *I don't see any reason why you wouldn't.*

"Q. You don't see any reason why you wouldn't. We're talking about the whole issue now. You remember that my definition of intentional; acts intentionally when it's his conscious objective or desire to engage in the conduct or cause the result. *So what you're saying if you find someone guilty of capital murder you would automatically answer issue number one yes?*

"A. *I can't conceive of any reason why you wouldn't.*

"Q. Or in any case why you wouldn't?

"A. I'm sorry?

"Q. Or in any case where you found somebody guilty?

"A. Well I can't conceive of any.

"MR. MONTGOMERY: Your Honor, we would ask Mr. Stamford be struck for cause.

"THE COURT: Be denied. (Emphasis supplied.)"

Appellant contends that the voir dire establishes that venireman Stamford would automatically answer the first special issue in the affirmative once the accused was found guilty of intentionally committing capital murder, thereby relieving the State of its burden of establishing beyond a reasonable doubt that the answer to special issue number one is "yes".

It is observed that the assistant district attorney made clear to Stamford that special issue number one should not be automatically answered "yes" because of a finding of guilt of intentionally committing capital murder, and that "a separate decision" is required. However, in response to the prosecutor's question, Stamford equated "deliberately" in special issue number one with "intentionally" and the prosecutor informed there was "nothing wrong with that." *See Heckert v. State,* 612 S.W.2d 549, 553 (Tex.Cr.App.1981); *Gardner v. State,* 730 S.W.2d 675 (Tex.Cr.App.1987); *Lane v. State,* 743 S.W.2d 617, 627 (Tex.Cr. App.1987); *Morrow v. State,* 753 S.W.2d 372 (Tex.Cr.App.1988) (all holding to the contrary). The prosecutor then followed with the now condemned "shooting into the ceiling" hypothetical which does not illustrate the difference between "intentionally" and "deliberately". *Gardner,* supra at 686–87; *Lane v. State,* supra.

While appellant's interrogation asking the prospective juror to put a period after "deliberately" in the phrasing of the first special issue before answering questions was improper interrogation, this was corrected following objection. Thereafter, asking the prospective juror to look "at the whole of issue number one", appellant's counsel was able to establish that the prospective juror Stamford "could see any reason why you wouldn't automatically answer special issue number one 'yes' after a finding of guilt as to intentionally committed capital murder." Stamford was further unable to conceive of any case where it would be otherwise. It was at this very point that the challenge for cause was made and overruled. There was no rehabilitation by the State nor any attempt to do

so. The peremptory challenge was then exercised by the appellant.

Recently, in *Lane v. State, supra,* we stated:

"As mentioned in *Gardner,* the defense may successfully challenge for cause a 'venireman who is unable to reconsider guilt evidence in the particular context of special issues.' Certainly the venireman who cannot distinguish between 'intentional' and a 'deliberate' killing will have substantial difficulty in this regard." *Lane,* supra at 629.

▮ Appellant made a proper challenge for cause which should have been sustained absent rehabilitation.[2] Failing to do so deprived appellant of the use of a peremptory challenge. Having exhausted his fifteen peremptory challenges, and not having been given any such additional challenge or challenges, and being forced to accept an objectionable juror as earlier described, the denial of the challenge for cause constituted reversible error. *Wolfe v. State,* supra, and its progeny.

For this reason the judgment of conviction must be reversed.

Other points of error concerning the voir dire examination present close questions but it is not necessary to address these or other points of error except that of sufficiency in view of our disposition of the case in light of points of error three and six.

In his sixteenth point of error, appellant challenges the sufficiency of the evidence to sustain the jury's affirmative finding to the second special issue submitted under Article 37.071, (b)(2), V.A.C.C.P., "...whether there is a probability that the de-

fendant would commit criminal acts of violence that would constitute a continuing threat to society; ..."

James Hanks, the deceased, was a quadrapalegic who lived in a Houston apartment complex unit modified for use by the disabled by a company known as Independent Lifestyles. He was paralyzed from the neck down, and was unable to use his muscles except for limited movement of his arms and neck. During the early morning hours of March 14, 1975, Hanks was lying in his bed in a pool of blood with stab wounds to both temples, and lacerations of the neck. He was still alive when found and was transported by ambulance to a hospital where he died from the stab wounds four days later.

Expert medical testimony established that the wounds were caused by a sharp instrument with a curved blade, probably a pair of scissors and that the cause of death was a stab wound to the left temple which pierced the victim's brain to a depth of two inches. The only sign of a struggle in Hanks' apartment was the fact that his pillows were scattered about and were covered with blood. The pillows were normally used to prop Hanks up while sleeping. Two items were found to be missing from Hanks' room, his wallet and a pair of scissors ordinarily kept on the bedside table. Witnesses familiar with Hanks' habits testified that he usually had $200–300 in cash in his wallet, which was kept under his pillow when he slept.

Appellant was shown to be an attendant working for Independent Lifestyles at the apartment complex where Hanks was at-

---

2. The State argues that any error was waived because the appellant violated Article 35.13, V.A.C.C.P. in that the prospective juror was not passed for acceptance or challenge first to the State and then to the defendant. The State points out that appellant presented his challenge for cause and when it was overruled he immediately exercised a peremptory challenge. It is observed that the State did not object to the procedure used, and the court permitted the exercise of the peremptory challenge and excused the prospective juror. By failing to object, the State waived the statutory procedure. Cf. *Welcome v. State,* 635 S.W.2d 828 (Tex.App. —Beaumont, 1982), P.D.R. refused.

It is interesting to observe that throughout the voir dire examination, appellant's counsel waited until he thought the record supported his challenge then made his challenge for cause. When it was overruled, he immediately exercised a peremptory challenge preserving the record for appeal in the state at which he made his challenge for cause. His exercise of a peremptory challenge usually cut off any thought of rehabilitation on the part of the State at least until such time as he had exhausted his peremptory challenges and had been forced to take an objectionable juror. And then it was very late in the day for the State.

tacked. He had worked the 7:00 a.m. to 3:00 p.m. shift on March 13, 1975. He did not report for work on March 14 or thereafter.

Edith Loretta Cobb of Denver, Colorado, testified that in the latter part of March, 1975, she had seen the appellant in Denver and that he told her that he had returned from Houston. When she offered to help him find a job, he revealed to her that he had killed a man, paralyzed man in Houston, that he had worked at a place there "a hospital or something" and had seen this man with about three hundred dollars or more, that he got off work in the afternoon and went home and got a gun, and went back about 2 or 3 o'clock in the morning to rob the man. According to Cobb, appellant told her he parked his car at the apartment complex and had his gun in case someone tried to stop him. He related that while he was looking for the money in the man's room, the man woke up, recognized him and called him by name, and asked what he was doing. Appellant then stated he grabbed some scissors and began to stab the man in the head and throat, and when he cried out, he took a pillow and put it over his head so no one would hear him, and continued to stab the man. When appellant stopped, the man appeared to still be breathing, so appellant began the stabbing again. When he thought the man was dead, he took the money and the scissors and left. He later threw the scissors "out" and had his brother take him to the airport for a flight to Denver. He had the gun in his suitcase on his trip to Denver.

Cobb reported the matter to the Denver police about April 16, 1975. On April 14, 1975 appellant was arrested in Idaho Falls, Idaho, for a traffic offense and was found in possession of a concealed weapon, a pistol, at that time.

At the penalty stage of the trial the State offered the three prior burglary convictions offered at appellant's first trial.

The same contention now raised was raised and rejected on appellant's first appeal. *Felder v. State*, 564 S.W.2d 776, 778 (Tex.Cr.App.1978). The posture of the instant appeal is basically the same as the first appeal, except that appellant's written extra-judicial confession was not introduced into evidence at the second trial. *See Felder v. McCotter*, 765 F.2d 1245 (5th Cir. 1985). While Edith Cobb's testimony about appellant's admissions to her may not have been in as great a detail as his written confession, it nevertheless was extensive and in its own right "impressive", covering all the major factors of the crime.

In *Felder*, supra, 564 S.W.2d at 778, we wrote:

"... The evidence discloses that three terms of imprisonment have had little, if any, effect on appellant's propensity to commit criminal acts. On the night of the instant offense, appellant armed himself with a pistol, and when he was recognized by the deceased, he brutally stabbed him even though the deceased was physically unable to stop or pursue appellant. At the time of his arrest, appellant was also armed with a pistol. This evidence is sufficient to support the jury finding that appellant would commit criminal acts of violence which would constitute a continuing threat to society. Art. 37.071(b)(2)."

█ This quote still accurately summarizes the evidence before the jury in the instant case of capital murder committed during the course of a robbery. We conclude that the evidence, viewed in the light most favorable to the jury's finding, supports the conclusion that any rational trier of the facts could have found, beyond a reasonable doubt, that appellant would commit criminal acts of violence which would constitute a continuing threat to society.

Appellant argues that the State did not offer any evidence that appellant had committed any criminal acts of violence from the time of his arrest in Idaho Falls, Idaho when he was 29 years old until the time of his second trial, when he was 41 years old. While the State did not, appellant could have proved he had not committed such acts and he did not. Appellant also urges that when arrested in Idaho armed with a gun, he did not try to use it or try to resist arrest. This evidence was before the jury

and it does not change the conclusion we have already reached. The point of error is overruled.

For the reasons stated, however, the judgment of conviction is reversed and the cause remanded to the trial court.

WHITE, J., concurs in the result.