Thomas Dewayne ELLASON, Appellant,

v.

The STATE of Texas, Appellee.

No. 69968.

Court of Criminal Appeals of Texas, En Banc.

June 19, 1991.

**19.** Also see discussion of point of error number 15, *infra.*

John C. Beatty, Allan K. Butcher, Fort Worth, for appellant.

Tim Curry, Dist. Atty. & C. Chris Marshall, Betty Marshall & Bob Gill, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

BENAVIDES, Judge.

The record reflects that the jury convicted Thomas Dewayne Ellason, henceforth appellant, of capital murder, namely, that he committed the murder of Trudy Smith during the course of burglarizing her residence. See V.T.C.A., Penal Code § 19.-03(a)(2). After finding appellant guilty of capital murder, the jury returned affirmative answers to the special issues that were submitted to it pursuant to Art. 37.071(b), V.A.C.C.P.[1] Thereafter, pursuant to Art. 37.071(e), V.A.C.C.P., the trial court automatically assessed appellant's punishment at death by lethal injection. Appeal to this Court is automatic. See Art. 37.071(h), V.A.C.C.P., and Rule 40(b)(1), Tex.R.App. Pro.

Appellant presents to us for review twenty six points of error. We will sustain his first point of error and affirm the conviction, as reformed. In his first point of error, appellant challenges the sufficiency of the evidence to sustain the jury's affirmative answer to Special Issue No. 2, "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071(b)(2), V.A.C.C.P.

In deciding whether there is sufficient evidence to support a jury's affirmative finding to the second special issue, that there is a probability[2] the defendant would commit criminal acts of violence that would constitute a continuing threat to society, the evidence is to be viewed in the light most favorable to the finding to determine whether any rational trier of fact could have answered, beyond a reasonable doubt, special issue number two in the affirmative,. See, e.g., *Keeton v. State,* 724

---

1. Art. 37.071(b), V.A.C.C.P., provides in part: "On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury: (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provoca-

tion, if any, by the deceased." The third special issue was not submitted to the jury in this cause.

2. This Court has held that the word "probability" is to be taken and understood in its usual acceptation—its generally understood meaning—in common language. *Cuevas v. State,* 742 S.W.2d 331, 346 (Tex.Cr.App.1987). By the plain wording of the second special issue, it is or should be obvious that *the issue calls for proof of more than a bare chance of future violence.*

S.W.2d 58, 61 (Tex.Cr.App.1987), henceforth *Keeton; Santana v. State,* 714 S.W.2d 1 (Tex.Cr.App.1986); and *Starvaggi v. State,* 593 S.W.2d 323, 325 (Tex.Cr.App. 1979). Proof of more than a bare chance of future violence is required to support an affirmative finding to the second issue. See *Smith v. State,* 779 S.W.2d 417, 421 (Tex.Cr.App.1989).

The record reflects that during the early morning hours of October 28, 1986, the then nineteen-year-old [3] appellant burglarized Smith's residence. At that time, appellant and his wife were living with the Auvenshines, his wife's parents, next door to Smith. Appellant's parents also lived in the same neighborhood. Smith, who lived alone, suffered from serious heart problems, a partial loss of hearing and was confined to a wheelchair as a result of suffering from polio. Appellant stated that he chose to burglarize Smith's residence because he believed he could easily get in, find something of value, and leave before Smith woke up.

Smith and appellant had known each other for many years. Smith considered the young children in the neighborhood, including the appellant when he was very young, as though they were her very own children. There is no evidence that appellant ever displayed any animosity towards Smith. In fact, the day before Smith was killed appellant and his wife brought the seventy-four-year-old Smith food to eat, as they had done in the past.

While appellant was committing the burglary, much to his surprise, Smith awoke and recognized him. Appellant then struck Smith in the face two or three times with his hands and began to flee the house. While exiting through the back door of the residence, appellant noticed a butcher knife laying on the kitchen counter. In a split second decision, appellant picked up the knife, returned to Smith's bedroom, and stabbed her three times. Smith died from those wounds. Appellant then left Smith's residence and returned to his residence, where he confessed his involvement in Smith's murder to his brother and a friend. Thereafter, appellant went to another friend's apartment where he injected one and a half grams of amphetamine into his arm. Appellant paid for the amphetamine with money he had stolen from the Smith burglary. Appellant then returned to his residence where he voluntarily cooperated fully with the police, giving them a complete confession in which he expressed remorse for murdering Smith.

The record reflects that at the time of this offense appellant was addicted to amphetamine and had not slept for ten days. This combination caused appellant to suffer from "amphetamine psychosis"; an intense paranoia which causes the individual to feel threatened by normal environment.

The record reflects that appellant's addiction to amphetamine can be traced to a hunting accident when he was fifteen years old. The accident ultimately resulted in his left big toe being amputated. Appellant's physician prescribed morphine as a pain reliever for the injury to his left big toe. Soon after being taken off morphine appellant experimented with and became addicted to amphetamine.

This hunting accident injury occurred when appellant was fifteen years old and according to the evidence had a tremendous traumatic effect on appellant because his then promising athletic career as a football player came to a screeching halt. Prior to the hunting accident appellant had been a football hero of sorts. His football coach testified at the punishment stage of the trial that appellant was "one of the better athletes on our team, was one of the starters on defense and one of the leaders of our team, was one the other kids would look up to. He was a good leader in the fact that he was one of the better athletes and he was not one of our problems. He was one that did things right for us."

---

**3.** The State asserted, during oral argument, that appellants age was not in the record. However, Roy Kirk Ellason, appellant's father, testified that appellant was born in 1967. The record reflects that the offense occured Oct. 28, 1986. Therefore even if appellant was born on Jan. 1, 1967, the oldest he could have been at the time of the offense was 19.

The State presented evidence, during the punishment stage of the trial, that appellant had committed eight to ten unadjudicated burglaries. However, it was also shown that these burglaries all occurred within a month before he burglarized Smith's residence. A Tarrant County Deputy Sheriff testified at the punishment hearing that appellant's reputation for being a peaceable and law-abiding citizen, while in jail, was bad. The deputy sheriff did not testify to any specific instances of misconduct. The State also presented testimony at the punishment hearing that appellant had twice physically assaulted his father-in-law. However, in order to marry his wife, appellant's father-in-law required both appellant and his wife to live with him and his family. This living arrangement caused friction between appellant and his in-laws due to the lack of privacy. In fact, one of the assaults occurred when appellant's father-in-law intervened during an argument that appellant and his wife were having. The other assault occurred when appellant referred to his father-in-law in the presence of others as an "old man," which apparently infuriated the father-in-law. There was evidence that appellant had abused his wife in the past; however, she testified on behalf of appellant that she was not seeking a divorce and was going to "stick with him throughout this crisis."

In answering the special issues, the jury may consider all of the evidence adduced at the guilt stage as well as the evidence adduced at the punishment stage of the bifurcated trial. See, for example, *Santana v. State*, 714 S.W.2d 1 (Tex.Cr. App.1986); *Beltran v. State*, 728 S.W.2d 382, 388 (Tex.Cr.App.1987); and *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978).

We are bound by the law to make certain that the death sentence is not "wantonly or freakishly" imposed, and that the purposes of Art. 37.071(b), V.A.C.C.P., are accomplished. *Horne v. State*, 607 S.W.2d 556 (Tex.Cr.App.1980); *Keeton v. State*, 724 S.W.2d 58 (Tex.Cr.App.1987). Not every murder in the course of a burglary merits a death sentence, our most final punishment. See *id.* In *Wallace v. State*, 618 S.W.2d 67 (Tex.Cr.App.1981), former Presiding Judge Onion, in a concurring opinion, stated the following: "... any reversal in a capital murder case based on the insufficiency of the evidence to support any special issue submitted under Article 37.071, V.A.C.C.P., at the penalty stage of the proceeding, is a precedent to be carefully considered as a guideline in future cases." We agree and accordingly will review cases where this Court has held that the State failed to present sufficient evidence to support the jury's affirmative answer to the second special issue. Also see *Milton v. State*, 599 S.W.2d 824 (Tex.Cr. App.1980); and *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978).

In *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980), henceforth *Brasfield*, we stated that the jury may consider many factors when determining whether the defendant would be a continuing threat of violence to society. Those non-exclusive factors include, but are not limited to the following:

1. The circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
2. The calculated nature of the acts;
3. The forethought and deliberateness exhibited by the carrying out of the offense;
4. The existence of a prior criminal record, and the severity of the prior crimes;
5. The defendant's age and personal circumstances at the time of the offense;
6. Whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;
7. Psychiatric evidence;
8. Character evidence, e.g., Whether the State presented any "bad" reputation evidence against the defendant.

In *Brasfield*, this Court held that the evidence was insufficient to support the jury's affirmative answer to the second special issue because of the following: the State did not present any evidence at the punishment stage of the trial; the evidence

at the guilt stage was circumstantial; the State did not present any psychiatric evidence at the punishment stage of the trial; the State did not present any evidence of prior criminal convictions by the defendant; nor did the State present any "bad" character or reputation evidence. Also see *Wallace.*

In *Roney v. State,* 632 S.W.2d 598 (Tex. Cr.App.1982), henceforth *Roney,* this Court reformed the defendant's sentence from death to life imprisonment. In finding that the facts of the case did not support the jury's affirmative finding to the second special issue, regarding whether the defendant would be a continuing threat to society, this Court made the following observations:

"Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold blooded crime,' such as appeared in *O'Bryan v. State,* 591 S.W.2d 464, 480 [Tex.Cr.App. 1979], where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a yes answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition." [citations omitted and emphasis in original].

In *Beltran v. State,* 728 S.W.2d 382 (Tex. Cr.App.1987), henceforth *Beltran,* the evidence showed that the defendant, entered a store armed with a pistol after which he shot and killed the store owner's wife as she was attempting to give the defendant money from the cash register. The State additionally presented evidence that the defendant had a "bad" reputation, had prior alcohol related offenses, and also had an unadjudicated offense of assault upon a peace officer. Nevertheless, this Court held that the evidence was insufficient to sustain the jury's affirmative answer to the second special issue.

In *Huffman v. State,* 746 S.W.2d 212 (Tex.Cr.App.1988), this Court held that the evidence was insufficient to support the jury's affirmative finding to the second special issue. In so holding, the Court stressed that there was no showing that the robbery was long in planning or that any act of violence was originally intended. Furthermore, there was evidence that the defendant was highly intoxicated when the murder was committed. The defendant also did not have any past record of any criminal acts of violence except for attacking a jail guard 27 hours after his arrest.

In *Keeton v. State,* 724 S.W.2d 58 (Tex. Cr.App.1987), this Court held that the jury's finding that the defendant would commit acts of violence which would constitute a continuing threat to society was not sufficiently supported by evidence. This was the holding that was reached in spite of the following: the murder occurred in the course of the commission of a robbery; the offense was unprovoked and cold-blooded; and that the defendant, without any warning or provocation, shot the cashier before he even announced his demand for money. However, there was no "bad" psychiatric evidence; no "bad" character or reputation evidence; and no "bad" evidence showing that defendant had committed violent acts in the past.

In *Warren v. State,* 562 S.W.2d 474 (Tex. Cr.App.1978), the court stated that the evidence was insufficient to sustain the jury's affirmative finding to the second special issue. We stated that the case reflected a "criminal act of violence, but not a calculated act." The evidence showed that Warren went unarmed to the victim's house for the purpose of burglarizing it. Once inside he found a pistol and after being surprised by the deceased, shot and killed the deceased.

In *Marras v. State*, 741 S.W.2d 395 (Tex. Cr.App.1987) we held the evidence to be insufficient to sustain the affirmative answer to special issue number two for two main reasons: no prior criminal convictions that could be considered under the submitted charge and the defendant made no attempt to shoot at his civilian or police pursuers after the shooting in question. In *Marras* the defendant shot and killed his victim while defendant was cruising the bar scene in Houston, armed with a handgun, with the express purpose of "rolling drunks." Two police officers testified that Marras's reputation was bad, another officer testified that he was a peaceable and trusted inmate.

In *Garcia v. State*, 626 S.W.2d 46 (Tex. Cr.App.1982), the defendant was convicted of murdering a Mexican national who had illegally crossed the border with two hundred dollars in his pocket. At first, the defendant agreed to give the victim a ride to a taxi stand, but instead robbed and murdered him. This Court, holding the evidence to be insufficient to sustain the jury's affirmative finding to the special issue number two, stated: "This was not the case where the robbery feature of the offense was long in the planning stage or a case where an armed individual drives around searching for an ideal situation for a robbery, intending to use violence if necessary."

In *Smith v. State*, 779 S.W.2d 417 (Tex. Cr.App.1989), the facts established that the defendant tied his victim to a bedpost with pantyhose and sexually assaulted her. The victim was then untied and stabbed fourteen times in the chest and back, including once through the heart. A forensic pathologist testified it was a brutal death but not "extremely" brutal, characterizing it as "a very typical sex murder." In holding that the facts of the offense alone were insufficient to support an affirmative answer to the second special issue, this Court stated:

> "From this we gather that in the mind of the State's own expert the offense for which appellant was convicted was not shocking or otherwise extraordinary even with respect to the multiple stab-

bing. We cannot conclude the circumstances of the offense are so heinous or evince an "aberration of character" so peculiarly dangerous as alone to justify an affirmative response to the second special issue. It has been said that § 19.03 of the Penal Code 'limits the circumstances under which the state may seek the death penalty to a small group of narrowly defined and particularly brutal offenses.' To hold the offense itself in this case was sufficient to prove future dangerousness would threaten to undermine the function of Article 37.071 ..." (citations omitted)

In the case at bar we also hold that the facts of the offense alone are insufficient to sustain an affirmative response to the second special issue. There is no evidence that the Smith burglary was "long in planning or that violence was originally intended." There is no evidence that appellant preplanned the burglary or the murder. Appellant's murder of Smith appears to have been an immediate reaction to being recognized by Smith after she unexpectedly awoke. There is evidence that appellant chose Smith's house specifically because he knew that she was bedridden and hearing impaired, thus believing that she would not wake up while he was committing the burglary. Moreover, the facts show that appellant entered Smith's residence unarmed and did not look for a weapon with which to arm himself while burglarizing Smith's residence. It was not until appellant was fleeing the scene, after having been recognized by Smith, and half way out the back door of the residence, did he contemplate using any type of violence on Smith.

In *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979), this Court opined: "[T]he calculated nature of defendant's act and the forethought with which he planned and executed his crime is probative of his propensity to commit future acts of violence." In this cause, however, there was no calculated nature or forethought on part of appellant. Appellant did not deny murdering Smith; rather, he immediately realized that what he did was wrong. He voluntarily cooperated with the police. He

stated that if he had one wish, it would be "to bring back Mrs. Smith."

We find, notwithstanding the case at bar reflects a horrible and senseless crime, the circumstances fall short of showing that it was the work of a cold-blooded and calculated killer.

■ The State argues that appellant is a violent person because of arguments he had with his in-laws, particularly his father-in-law. Given the circumstances of the required domicile with his wife's family, we are unable to conclude that the difficulties appellant had with his in-laws were probative of whether he would be a continuing threat to society. Invariably, this living arrangement caused many disagreements between appellant and his father-in-law, which on occasion resulted in physical encounters. However, we find that the kind of disagreements and altercations that occurred between the nineteen-year-old appellant and his father-in-law, who required appellant to live with him and his family as a condition precedent to marrying his daughter, not particularly probative of whether the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

We further observe that the record reflects that the psychological testimony that was presented in this cause was favorable to appellant. Richard Schmitt, a psychologist, testified that appellant's criminal activities were strictly those necessary to supply drugs required by his addiction to amphetamine and that appellant suffered from a genetic predisposition to addiction. Appellant's drug addiction was traced to a hunting accident when he was fifteen years old where he accidently shot his left foot which ultimately resulted in his left big toe being amputated. Due to the accompanying pain, appellant was prescribed morphine two times a day over a two month period. Soon after he stopped taking the medically prescribed morphine he began to experiment with amphetamine to which he eventually became addicted. At the time of the murder, appellant had been using amphetamine for ten straight days without sleeping the entire time. Schmitt testified the combination of the amphetamine and lack of sleep caused appellant to suffer from "amphetamine psychosis," which is an "intense paranoia" resulting in a feeling of threat from the environment. Schmitt also testified that if appellant were free from his addiction to amphetamine he would not engage in further criminal activity. Schmitt further testified that appellant was the type person who could successfully complete a drug treatment program and that such programs are available in the penitentiary. Schmitt stated a drug-free appellant would not pose a danger to "society." see *Rougeau v. State*, 738 S.W.2d 651 (Tex.Cr.App.1987).

■ The state argues that appellant's violent disposition is evidenced by his participation in high school football and by joining his father on hunting trips because, the State contends, they are "violent" sports. The State appears to argue that these two activities demonstrate that there is a probability that appellant will commit criminal acts of violence that would constitute a continuing threat to society. We reject the argument that participation in these so called "violent sports" demonstrate future dangerousness.

■ Although we agree with the State that the mere fact that appellant was only nineteen years old at the time of offense is insufficient, standing alone, to prevent imposing the death penalty, youth by its very nature is a mitigating factor to be noted and considered. See *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed 2d 1 (1982), where the Supreme Court stated:

> "Youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults."

In *Schall v. Martin*, 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984), the Supreme Court stated:

"Young people are in the early stages of their growth; their intellectual development is incomplete; they have only limited practical experience; and their value systems are not yet clearly identified and firmly adopted."

Youth alone is not particularly probative of whether one will or will not commit criminal acts of violence that would constitute a continuing threat to society. However when youth is intertwined with other evidence, as in this cause, its significance as a modifying factor becomes clearer. In this cause we are faced with a wide range of evidence concerning a young man whose genetic predisposition to addiction was fueled by the unwise medical prescription of morphine when he was only fifteen years of age. There was testimony that appellant's criminal acts were caused by his addiction to amphetamine. Expert testimony established that without drugs the appellant would not be a threat to society, that he is the type of person who would benefit from drug rehabilitation, and that drug treatment programs are available in the penitentiary.

In light of our previous decisions, the circumstances of the offense, and the evidence related to the issue of appellant's future dangerousness, we believe, viewing all the evidence in the light most favorable to the affirmative answer to the second special issue, that the evidence is insufficient. Therefore, appellant's punishment is reformed from death to life imprisonment. Point of error number one is sustained.

█ In consideration of the fact the judgment of death is reformed to reflect a sentence of life imprisonment, thus giving appellant the more favorable sentence possible in this cause, we will not discuss the remaining points of error that pertain to the punishment phase of the trial.[4] See *Sanne v. State*, 609 S.W.2d 762, 767 (Tex. Cr.App.1980). This holding, however, af-

fects only the punishment phase of the trial; therefore, we will next consider the points of error that pertain to the guilt phase of the trial.

█ In points of error seven and eight appellant contends the trial court erred in excusing sua sponte two veniremembers from jury service in that they were not shown to be absolutely disqualified. Veniremember Bonnie Wood Patterson asked to be dismissed from further jury service because she suffered from back pain due to three surgeries she had on her back, the last surgery occurring in 1984. Patterson stated that she occasionally took pain medication which made her drowsy. Patterson opined that she would be able to carry out her oath yet that when she had a muscle spasm she could not think clearly. After questioning by both prosecutor and defense counsel the prosecutor stated that he would "agree to excuse" Patterson. Defense counsel then requested that they be allowed to further question Patterson. The trial court then decided that it did not think that Patterson could serve because of her back problems. Appellant's trial counsel then gave up his request for further questioning of Patterson and objected to her being dismissed based on various Constitutional grounds. The trial court then restated its ruling that Patterson was dismissed due to health problems. Appellant contends that since Patterson did not qualify for absolute disqualification under Art. 35.16, V.A.C.C.P., and that the trial court did not excuse Patterson "expressly pursuant to Article 35.03," her excusal was improper.

It is obvious from the record that the trial court did not excuse veniremember Patterson for cause. Appellant cites no authority nor advances any argument for his contention that the trial court was precluded from excusing Patterson without expressly stating that it was done pursuant

---

4. Points of error that relate to punishment and are therefore moot are the following: *"Penry"* error, inability to give effect to mitigating evidence; erroneously granting state's challenges against venirepersons because of their views on the death penalty; erroneous exclusion of venirepersons for inability to differentiate between

"intentionally" and "deliberately"; reduction of the state's burden of proof on second special issue; "probability", as used in Art. 37.071 V.A.C.C.P., is a vague and indefinite term; wrongful admission of testimony on future dangerousness; and erroneous restriction of punishment evidence.

to Article 35.03. Article 35.03 § 1 V.A.C.C.P. provides:

... the court shall then hear and determine excuses offered for not serving as a juror, and if the court deems the excuse sufficient, the court shall discharge the juror or postpone the juror's service to a date specified by the court.

Patterson's request to be dismissed was a request to be excused due to her health problems. We believe that Art. 35.03 authorized the trial court to excuse Patterson due to her health problems and that such action was not an abuse of discretion. See *Harris v. State*, 784 S.W.2d 5, 18 (Tex.Cr. App.1989) (The excusal of a prospective juror under Art. 35.03, § 1, is within the sound discretion of the trial judge, and his decision will not be disturbed on appeal if the record supports his ruling).

■ Appellant next contends that venireman David William Rife was also improperly excused sua sponte by the trial court. The record reflects that after individual voir dire had begun Rife testified that his concerns about his father's illness (cancer that had recently worsened) and his father's business would interfere with his duties as a juror; that jury service would leave his four-year-old child without adequate supervision, and that he wanted to claim his exemption. The State then asked that Rife be excused because Rife had claimed a timely exemption. The trial court excused Rife, however, because "the medical condition of his (Rife's) father is such that it is subject to some rather radical changes in the next week or two." After Rife left the courtroom appellant objected only on the basis of violations of various constitutional provisions. Appellant's objection at trial did not address the sua sponte nature of the trial court's action. On appeal appellant complains that the trial judge erred by sua sponte excusing Rife. We find that appellant's complaint on appeal does not comport with his objection at trial and did not call to the attention of the trial court the complaint

now made on appeal. Error, if any, was not preserved for review. See *Richardson v. State*, 744 S.W.2d 65, 71 (Tex.Cr.App. 1987). Points of error seven and eight are overruled.

■ In points of error fifteen through nineteen appellant contends the trial court erred in granting the State's challenges for cause on five veniremen in that they expressed prejudice against probation for the offense of murder. Appellant contends that the trial court reversibly erred in granting the challenges because the prosecutors purposefully depicted the offense of murder in the most "heinous and cold-blooded fashion" possible, by excluding the lesser culpable mental state of "knowingly" when defining murder, in hopes they might increase their chances of disqualifying veniremembers on the range of punishment for murder. The State's reply is that appellant has failed to show any error and the State did not misrepresent the law.

The record reflects that at trial appellant did not object to any of the prosecutor's references to the offense of murder as "intentional" or "an intentional killing" of which he now complains. We find, pursuant to Tex.R.App.Proc. 52(a), appellant has failed to preserve his complaints, therefore, points of error fifteen through nineteen are overruled.

■ In point of error number twenty appellant contends the trial court erred in denying appellant's challenge for cause on venireman Richard C. Alden, henceforth Alden, because of his bias and prejudice against the parole law.[5] In support of his contention appellant cites *Felder v. State*, 758 S.W.2d 760 (Tex.Cr.App.1988), where we held the trial court improperly denied defendant's challenge of a juror for cause when the juror clearly indicated he could not take oath nor honestly state that he would not consider parole when deciding on punishment for defendant, even though he did state that he would try to the best of his ability to follow the oath and the court's instructions. In addition, recognizing that

5. The matter of parole is not a proper consideration for jury deliberation on punishment in a capital murder trial. See, e.g. *Felder v. State*, supra; *O'Bryan v. State*, 591 S.W.2d 464, 478 (Tex.Cr.App.1979), cert. denied, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846.

we were faced with a cold record, we clearly stated that in evaluating a veniremember's response, due deference would be given to the trial court.

In this cause, however, venireman Alden testified only that "I don't like the way it (parole) is operated, I don't know how it operates, but I don't like the results I see." After further questioning, Alden stated his feelings about parole would not affect his answers to either special issue. Unlike the facts in *Felder*, in the present cause Alden was never asked nor did he testify that he could not take his oath as a juror. Basically, in *Felder* it was shown that the venireman's feelings on parole would affect his answers to the special issues; in the present cause such was not shown. We have examined the record as a whole and refuse to hold that the trial court abused its discretion in denying appellant's challenge for cause. Point of error twenty is overruled.

■ In points of error twenty-five and twenty-six appellant contends the trial court erred in refusing to conduct the voir dire examination of two veniremembers at the first available opportunity. The record reflects that two veniremembers failed to appear at their designated time and attempts at locating them were unsuccessful. The trial court then proceeded with the next juror. Both veniremembers eventually appeared a few days after their scheduled time. Instead of conducting voir dire at that time, the trial court placed them at the bottom of the jury list. Appellant does not complain of the initial passing of the veniremember, rather, he contends that the court erred in not conducting the voir dire examination when the two veniremembers first appeared.

At trial, appellant objected only to the passing of the veniremembers, he made no objection to placing them at the end of the list once they did appear. Therefore, appellant has failed to preserve error. Points of error twenty-five and twenty-six are overruled.

Because we have found that the evidence is insufficient to support an affirmative answer to the second special issue under Article 37.071(b), supra, the judgment is reformed to reflect a punishment of life imprisonment. See, e.g. *Smith v. State*, supra; *Keeton*, supra.

Accordingly, we reform the death sentence to life imprisonment and finding no other error, we affirm the conviction, as reformed.

---

* This opinion was originally drafted by Judge MARVIN O. TEAGUE just prior to his death.

McCORMICK, P.J., and MILLER, CAMPBELL, and WHITE, JJ., dissent to point of error 1, but otherwise join the remainder of the majority opinion.